THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOHNNIE B. WILKERSON JR., Defendant-Appellant.

Fourth District   No. 4—82—0400

Opinion filed April 17, 1984.

Marian Kurata, of Urbana, for appellant.

Robert G. Frederick, Special Prosecutor, of Urbana (Robert J. Biderman and John M. Wood, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE MILLER delivered the opinion of the court:

The defendant was tried by a jury, convicted of several counts each of attempted murder, armed violence, and aggravated battery, and sentenced on the two more serious groups of convictions, those for attempted murder and armed violence, to concurrent terms of 25 years' imprisonment. On appeal the defendant raises a number of questions concerning the course and conduct of his trial and the sentences that were imposed. We conclude that no error occurred and therefore affirm the defendant's convictions and sentences for attempted murder. The convictions for armed violence and aggravated battery and the sentences for armed violence are redundant, however, and must be vacated.

The convictions arose from a dispute that occurred between the defendant's family and some neighbors on September 23, 1978, at an apartment complex in Champaign. That day Vivian Turner, the

defendant's sister, learned that her son had been bitten by a neighbor's son and complained about this to the neighbor, Katie Bolden. Turner and Bolden got into a fight, which a police officer ended temporarily. Later, Turner and Bolden resumed fighting. The defendant and his brother, Johnnie "Little Johnnie" Wilkerson, then appeared; the defendant was armed, and he shot and wounded two members and a friend of the Bolden family. The defendant also was wounded. Whether anyone in the Bolden group was armed was disputed at trial.

This was the defendant's second trial on these charges; his earlier convictions were vitiated by trial error and reversed on appeal (*People v. Wilkerson* (1981), 87 Ill. 2d 151, 429 N.E.2d 526).

I

The defendant argues first that he was denied a fair trial because of *per se* conflicts of interest inhering in the persons appointed here as special prosecutor and special defense counsel.

At arraignment after the cause was remanded for a new trial, the defendant objected to the appointment of the public defender as his counsel because he feared that a conflict of interest could arise from the public defender's simultaneous representation of his brother on charges arising from this same incident. The defendant requested the appointment of Marian Kurata, who had successfully argued his earlier appeal. The trial court granted the defendant's request and appointed Kurata as defense counsel. Robert Frederick had been appointed to serve as special prosecutor.

Later, Kurata moved to vacate the appointment of Frederick as special prosecutor and her own appointment as defense counsel. The basis for the motion was Frederick's and Kurata's former employment together in the Champaign County public defender's office during the defendant's first trial on these charges. At that time, Frederick was head of the office, Kurata was an assistant, and another assistant was representing Vivian Turner, the defendant's sister, on charges arising from this same incident; the defendant was represented by privately retained counsel. The motion alleged that trial strategy might have been discussed by or made available to these various lawyers.

At a hearing on this motion, Frederick said that he could remember no conversations with Turner's lawyer regarding this case and that he had no knowledge of that representation. The trial court denied the motion to vacate Frederick's appointment as special prosecutor. The trial court then asked the defendant whether he wanted Kurata to continue as his lawyer, and the defendant replied that he

did. The court denied the motion to vacate Kurata's appointment as defense counsel.

■ Frederick's service here as special prosecutor did not violate the rule forbidding criminal prosecution by a person who has acquired from the accused confidential information concerning the particular offense. (*People v. Gerold* (1914), 265 Ill. 448, 107 N.E. 165; *People v. Rhymer* (1975), 32 Ill. App. 3d 431, 336 N.E.2d 203; *People v. Curry* (1971), 1 Ill. App. 3d 87, 272 N.E.2d 669.) In *Gerold* the court said:

> "An attorney cannot be permitted to assist in the prosecution of a criminal case if by reason of his professional relations with the accused he has acquired a knowledge of the facts upon which the prosecution is predicated or which are closely interwoven therewith." (*People v. Gerold* (1914), 265 Ill. 448, 478, 107 N.E. 165, 177.)

Because Frederick never had a professional relationship with the defendant, the only way in which he could have obtained the disqualifying information would have been through conversations with the defendant's privately retained lawyer or, less directly, with the assistant in his own office who was handling Vivian Turner's case. Both those routes are too attenuated to compel the conclusion that Frederick occupied a position that gave him access to disqualifying information. Further, we note that at the hearing on the pretrial motion, Frederick stated that he had no knowledge of defendant's case from any prior representation.

We note also that a public defender's office is not regarded *per se* as a law firm or single entity in considering conflicts of interest arising from multiple representation. (*People v. Nelson* (1980), 82 Ill. 2d 67, 411 N.E.2d 261.) Therefore, Frederick's former position as head of the office cannot by itself mean that he should be deemed to have acquired whatever information his assistant defenders acquired.

■ The defendant also objected to Kurata's appointment as special defense counsel. Kurata served as an assistant public defender during Frederick's tenure as head of that office and while Vivian Turner was being represented on charges arising from this same incident. This by itself does not compel Kurata's disqualification. (*Nelson.*) More important, Kurata's earlier employment as an assistant public defender under Frederick's authority was placed on the record in the defendant's presence. The defendant persisted in his desire to have Kurata serve as his lawyer, however. Therefore, the defendant has knowingly waived any conflict of interest that might have derived from Kurata's previous employment.

The defendant also argues that Kurata's agreement to evidentiary

stipulations proposed by the State is evidence of a less than vigorous defense. Before trial the special prosecutor asked the court to admit stipulations concerning the chain of custody of five bullets that either had been found at the scene or had been removed from the victims' bodies. Kurata told the court that she signed the stipulations over the defendant's objection; she believed that the defendant could secure a similar stipulation in exchange for agreement here. The defendant told the court that he did not want to help the State prove its case against him. The stipulations were admitted into evidence, and the defendant repeated his objection when they were read to the jury. The defendant believed that the State and defense counsel were conspiring against him.

The relationship between a lawyer and her client is that of agent and principal; a lawyer is bound to follow the lawful instructions of her client, and her actions are restricted to the scope of the authority conferred. (*Chiappetti v. Knapp* (1974), 20 Ill. App. 3d 538, 314 N.E.2d 489; *Fleener v. Fleener* (1970), 133 Ill. App. 2d 118, 263 N.E.2d 879.) At the same time, though, the lawyer is the manager of the lawsuit, and therefore decisions on trial strategy and tactics may be made by counsel alone. *People v. Williams* (1966), 36 Ill. 2d 194, 222 N.E.2d 321.

■ The decision whether to stipulate with the State to the chain of custody of the various bullets involved an assessment of trial strategy and tactics, and as such, it was Kurata's decision to make, based upon her professional judgment as the defendant's lawyer. Kurata entered into the stipulations in return for the special prosecutor's promise that he would stipulate to the chain of custody of a bullet that the defendant was seeking to have removed from his body. The defendant believed that the bullet's characteristics would provide evidence of an undiscovered gun, buttressing his assertion that the victims were armed and he acted in self-defense. Thus, the defendant stood to benefit from Kurata's agreement. Therefore, we do not find evidence of a conspiracy between Kurata and the special prosecutor, her former employer. We note that the defendant specially requested that Kurata be appointed to represent him in this appeal, despite his earlier disagreements with her, so he has waived any conflict arising from that.

## II

The bullet was never removed from the defendant's body, however, and that forms the basis of his next argument: that the trial court should have ordered its removal or, alternatively, should have granted his motion for a continuance so that he could have time to

find a surgeon that would perform the necessary operation.

The defendant filed a motion on March 5, 1982, asking the court to order the surgical removal of a bullet that had been lodged in his buttocks since the date of the disturbance at the apartment complex. The defendant wanted to have the bullet examined by a forensic scientist; the defendant believed that this might produce evidence that the victims were armed and that he acted in self-defense. The trial court ordered a physical examination of the defendant by Dr. R. B. Helfrich and reserved its ruling on the motion.

After examining the defendant, Dr. Helfrich wrote the court a letter reporting that the bullet was embedded in the defendant's right buttock but that surgery was "not indicated on medical grounds." Several days later the court received a letter from Krail Lattig, a forensic scientist employed by the Department of Law Enforcement, who said that a reasonably close approximation of the bullet could be made by using X rays but that that method would not make possible a specific identification of the cartridge and weapon type.

Needing more information, the court granted the defendant a continuance on March 26, moving the start of the trial back more than a month, from April 5 to May 10. In response to the court's request for elaboration on several points, Dr. Helfrich sent another letter, explaining why removal of the bullet was medically unwise and what it would cost. Dr. Helfrich said that the bullet was located near the defendant's sciatic nerve and that removing the bullet might injure the nerve, which could permanently paralyze the lower half of the defendant's body. Dr. Helfrich also believed that the bullet might elude discovery. He said that the surgery would take more than an hour and cost more than $600, not include the hospital's separate charges. After holding another hearing, the court denied the defendant's motion for removal of the bullet.

On April 26, 1982, the defendant filed a supplemental motion for a continuance for more time to find a surgeon that would be willing to perform the operation. The motion listed the names of a dozen doctors who had refused either to examine the defendant or to perform the surgery. The motion was denied; the trial began on May 10, 1982.

■ The court did not err in failing to order the removal of the bullet. The operation would have been elective and therefore outside the scope of section 103—2(c) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1981, ch. 38, par. 103—2(c)), which provides that persons in custody shall be afforded medical treatment if required; the defendant was in custody until April 7, 1982, when he was released on bond. Dr. Helfrich predicted that the operation would cost more

than $600, well in excess of the amount, $250, that may be paid for a defendant's necessary expert witnesses (see *People v. Watson* (1966), 36 Ill. 2d 228, 221 N.E.2d 645, extending the statutory provision (Ill. Rev. Stat. 1981, ch. 38, par. 113—3(d)), which restricts itself to capital cases, to a prosecution for forgery). Most important, no surgeon was available to perform the operation. Thus, the defendant's constitutional rights to compel the production of witnesses in his behalf (U.S. Const., amends, VI, XIV; Ill. Const. 1970, art. I, sec. 8) were not violated.

■ Nor did the court err in refusing to grant the defendant's supplemental motion for a continuance. The defendant had already been granted the continuance of more than a month so that he could try to arrange for the surgery. The court was not required to wait indefinitely while the defendant searched for a willing surgeon. Allowing the defendant more time would not likely have led to success. The professional assessment before the court of the operation's dangers, along with the defendant's own list of the dozen unwilling surgeons, meant that only with great difficulty would the defendant ever be able to find someone who would do the operation. The granting of a continuance is reserved to the discretion of the court. (*People v. Pinkston* (1976), 44 Ill. App. 3d 357, 357 N.E.2d 1386.) Under the circumstances presented here, the trial court's denial of the motion for a further continuance was not an abuse of discretion.

### III

#### A

The trial court allowed the State to read to the jury transcripts of the testimony that Dr. Walter Rhode and Veve Grant had given at the defendant's first trial. Rhode died before the defendant's second trial, and the State could not find Grant. A witness' previous testimony may be admitted into evidence at a trial, as an exception to the hearsay rule, if the witness has become unavailable and the current opponent of the evidence had the opportunity to cross-examine the witness at the earlier hearing. (*Laboy v. Industrial Com.* (1978), 74 Ill. 2d 18, 383 N.E.2d 954; *People v. Jackson* (1968), 41 Ill. 2d 102, 242 N.E.2d 160.) This does not violate, in a criminal proceeding, a defendant's constitutional rights to confront the witnesses against him. *People v. Allen* (1974), 56 Ill. 2d 536, 309 N.E.2d 544.

■ Dr. Rhode was the admitting physician in the hospital emergency room to which the victims were taken after the shooting, and he testified at the first trial regarding the nature of their injuries.

The defendant argues that use of this testimony at his second trial was cumulative and unduly focused the jury's attention on the medical aspects of the case. At the second trial, in addition to the transcript of Rhode's earlier testimony, the State presented the live testimony of the three physicians who had treated the victims for their various wounds; also, the victims themselves testified about their medical treatment. Rhode was the first doctor to treat the victims of the shooting, and he described their conditions at the time they were admitted to the hospital. His testimony included the locations of various bullet wounds in their bodies. As the first examining physician, Rhode was able to provide information that the other medical witnesses could not. For these reasons, the testimony had probative value, and its use was not cumulative.

The State also presented a transcript of Veve Grant's testimony from the defendant's first trial. Grant, a resident of the apartment complex where the dispute occurred, saw the defendant and his brother shoot at the unarmed Bolden group. The defendant argues that the State failed to show Grant's unavailability at the time of the second trial and that her testimony had no probative value.

In arguing before trial for the use of Grant's earlier testimony, the special prosecutor explained that he had traced Grant to West Memphis, Arkansas, but that he had not been able to locate her after that. He also said that he was continuing his efforts to locate her. The State was unsuccessful, however, so ultimately the transcript was used.

The record shows that the State made a good faith effort to locate Grant and obtain her presence at the defendant's second trial. Therefore, the trial court correctly ruled that she was unavailable, which would permit the use of her previous testimony. *Ohio v. Roberts* (1980), 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531.

Grant's testimony had probative value. She saw the defendant and his brother fire weapons, and she said that the victims did not return any fire. These observations were relevant, for they tended to negate the defendant's theory that he was acting in self-defense. The court did not err in allowing the transcript to be read to the jury.

## B

The defendant also argues that the trial court erred in permitting the State to read to the jury a transcript of his own testimony from his first trial. Here, the defendant was tried alone; earlier he was tried together with his brother, Little Johnnie Wilkerson, and sister, Vivian Turner. There, Little Johnnie Wilkerson decided at the last

moment to rely on an alibi defense; the defendant argued self-defense. The defendant asserts that his testimony was influenced by the trial together of the several defendants and by the sudden change in his brother's defense. The defendant concludes that because he had given this earlier testimony under vastly different circumstances, the trial court should not have allowed the State to use it here.

■ As a general rule, a defendant's earlier testimony is admissible against him at a later trial. (*Harrison v. United States* (1968), 392 U.S. 219, 20 L. Ed. 2d 1047, 88 S. Ct. 2008; *Miller v. People* (1905), 216 Ill. 309, 74 N.E. 743; *People v. Peterson* (1982), 108 Ill. App. 3d 856, 439 N.E.2d 1103.) In the second trial, the defendant was free of course to explain any discrepancies between his current testimony and his earlier testimony. That the presence of the codefendants influenced the defendant's testimony at his first trial is not a reason to prohibit its later use.

## IV

Over the defendant's objections, the jury received instructions on accountability, an aggressor's use of force, and provocation and retaliation. The defendant argues that the evidence presented at trial did not justify instructing the jurors on these points.

Both the State and the defendant are entitled to instructions embodying their separate theories of the case; evidence supporting a particular theory will justify giving an instruction in it. (*People v. Isenberg* (1978), 60 Ill. App. 3d 325, 376 N.E.2d 778.) The instructions in question were supported by the evidence.

■ The jurors received Illinois Pattern Jury Instruction (IPI), Criminal, No. 5.03 (2d ed. 1981), setting forth the circumstances when one person is accountable for the acts of another; accountability was also included in the various issues instructions on the offenses. The State introduced evidence that the defendant and Little Johnnie Wilkerson acted together in attacking the Bolden group and that the defendant, finding himself out of ammunition, told his brother to shoot Rickey Jones, a friend of the Boldens; Little Johnnie Wilkerson then shot Jones. This evidence tended to establish the defendant's accountability for his brother's acts (Ill. Rev. Stat. 1981, ch. 38, par. 5—2(c)). That a defendant may be guilty as a principal does not preclude instructions on accountability (*People v. Taglia* (1979), 76 Ill. App. 3d 199, 392 N.E.2d 725); also, accountability instructions may be used even though the defendant is tried alone (*People v. Thomas* (1979), 72 Ill. App. 3d 28, 389 N.E.2d 1316). It was proper to instruct the jury on that theory.

The jurors also received IPI Criminal No. 24—25.09 (2d ed. 1981), which sets forth the circumstances when an initial aggressor is justified in using force, and IPI Criminal No. 24—25.11 (2d ed. 1981), which provides that a person may not provoke the use of force against himself so that he may retaliate later. These instructions reflect several aspects of the statutory provisions regarding an aggressor's use of force. (Ill. Rev. Stat. 1981, ch. 38, pars. 7—4(b),(c).) These two instructions may be used if the State introduces evidence that the defendant was the aggressor. (*People v. Slaughter* (1980), 84 Ill. App. 3d 1103, 405 N.E.2d 1295.) The defendant testified that he was shot first either by one of the Boldens or their friend, Jones, and only then fired his gun. Other witnesses, however, testified that the defendant appeared with a gun and shot at the Bolden group, who were sitting peacefully and unarmed on their front porch. This testimony justified giving these instructions.

## V

The defendant was convicted of three counts of attempted murder, three counts of armed violence, and six counts of aggravated battery. The trial court sentenced the defendant to six concurrent terms of 25 years' imprisonment on the convictions for attempted murder and armed violence; the court did not sentence the defendant on the convictions for aggravated battery, concluding that they merged with the attempted murder convictions.

The State agrees with the defendant that his convictions for armed violence and aggravated battery must be vacated because they are based on the same acts as the convictions for attempted murder. (*People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838.) This is appropriate here, so only the attempted murder convictions remain, and the sentences for armed violence must be vacated. (*People v. Jones* (1982), 108 Ill. App. 3d 880, 439 N.E.2d 1011.) Because of this result, we need not address the defendant's argument under *People v. Van Winkle* (1981), 88 Ill. 2d 220, 430 N.E.2d 987, and *People v. Haron* (1981), 85 Ill. 2d 261, 422 N.E.2d 627, that the armed violence indictments should have been dismissed because they were based on double enhancement.

The defendant also argues that his concurrent 25-year sentences for the three attempted murder convictions are excessive and grossly disparate, for his brother received three concurrent 6½-year sentences for attempted murder, which he pleaded guilty to after remand of his cause.

A sentence imposed by a trial court will not be altered on appeal

without a showing that the trial court abused its discretion in imposing that particular sentence. (*People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541.) At the same time, however, fundamental fairness requires that defendants similarly situated should not receive grossly disparate sentences. *People v. Gokey* (1974), 57 Ill. 2d 433, 312 N.E.2d 637; *People v. Nester* (1976), 40 Ill. App. 3d 735, 353 N.E.2d 23.

In the case at bar, a rational basis exists to explain the disparity in the sentences imposed upon the defendant and his brother. First, the evidence introduced at trial shows that the defendant was more culpable than his brother. Witnesses testified that the defendant fired a shot into the air, yelled "Hold it," and then began shooting at them. When Jones fell, the defendant stood over him and pulled the trigger several times. The defendant was out of ammunition and yelled at his brother to shoot Jones. Little Johnnie Wilkerson then shot Jones in the leg. The record shows that defendant did the bulk of the shooting and, when he ran out of ammunition, ordered his brother to shoot a wounded man.

Second, the defendant had a more extensive and more serious criminal record than his younger brother. Little Johnnie Wilkerson's criminal record comprises four juvenile convictions in Ohio: assault with intent to rob, breaking and entering, auto theft, and aggravated burglary. The defendant has a longer criminal history, and it includes several violent crimes. In 1969 he was convicted of possessing a loaded gun in an automobile; in 1974 he was convicted of aggravated battery for shooting a person several times; in 1978, he was convicted of disorderly conduct.

A sufficient basis exists in the record to justify the lengths of the sentences imposed by the trial court. Having examined the record, we conclude that the trial court did not abuse its discretion in sentencing the defendant.

The defendant's convictions for armed violence and aggravated battery and his sentences for armed violence are hereby vacated. In all other respects, the judgment of the circuit court of Champaign County is affirmed.

Affirmed in part and vacated in part.

TRAPP and WEBBER, JJ., concur.