THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
BESSIE I. FLEMING, Defendant-Appellant.

Fourth District   No. 4—86—0469

Opinion filed May 4, 1987.

Daniel D. Yuhas and Gary R. Peterson, both of State Appellate Defender's Office, of Springfield, for appellant.

Thomas K. Leeper, State's Attorney, of Quincy (Kenneth R. Boyle, Robert J. Biderman, and Linda Cullom, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE McCULLOUGH delivered the opinion of the court:

On March 6, 1986, the defendant, Bessie I. Fleming, was charged by information with three counts of murder. (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(a)(1), 9—1(a)(2).) The defendant allegedly shot and fatally wounded her husband, Tom Fleming. Following a jury trial, the defendant was convicted of two counts of murder and was subsequently sentenced to the Department of Corrections for a term of 20 years.

The defendant appeals her conviction alleging three errors. First, defendant claims the court improperly instructed the jury regarding the initial aggressor's use of force in self-defense. Second, the defendant maintains that the court erred in failing to instruct the jury that the burden was on the State to negate the "unreasonable belief" and "intense passion" elements of voluntary manslaughter. Finally, defendant asserts that the court erred in conditioning the admission of defendant's expert's testimony upon the disclosure of a written report or by failing to grant the defense reciprocal rights with respect to the State's expert's testimony. We affirm.

On the morning of March 6, 1986, the defendant shot and killed her husband. At trial, the defendant admitted killing her husband, but claimed that she acted in self-defense. In support of this assertion, the defendant maintained that she was a victim of the battered wife syndrome, which caused her to honestly believe that she was in imminent danger of death or great bodily harm at the time of the murder.

Evidence adduced at trial established that the defendant was 48 years old with no prior criminal history. In 1981, the defendant moved in with Tom Fleming and they were married in August of 1984. Tom Fleming was 52 years old, had been previously married three times, and was an alcoholic.

The five-year relationship of the parties was stormy and unpredictable, marred by vicious physical and psychological abuse. This abuse generally occurred after Tom had been drinking and was often followed by periods of calm and loving behavior. Expert testimony at trial was uncontradicted that the defendant was a victim of the battered wife syndrome.

Police were dispatched to Bestom Trucking in Quincy, Illinois, on the morning of March 6, 1986, to investigate the death of Tom Fleming. Bestom was owned and managed by the defendant and her

husband. Police advised the defendant of her *Miranda* rights and proceeded to question the defendant, who was very cooperative and appeared calm, collected, polite, and soft-spoken. Over the course of the next six to eight hours, the defendant told four completely different versions of the events which ultimately transpired in the death of her husband.

Initially, the defendant denied any knowledge of or participation in the shooting. The defendant claimed that she went to work at Bestom, left to buy breakfast, and returned to find Tom lying on the floor. Defendant told the police that she and Tom had a stable and fulfilling relationship.

After being questioned regarding ownership of a gun, defendant gave a second account of what happened. The defendant stated that shortly after she married Tom he began physically abusing her. In July of 1985, the defendant stated that she attempted to take her own life but that Tom had intervened. After her suicide attempt, Tom entered a detoxification center in St. Louis for approximately three weeks. Subsequent to treatment, Tom did not drink for approximately three months. During this time there were no incidents of abuse. The defendant stated that on November 4, 1985, Tom began drinking again and shortly thereafter the physical and psychological abuse resumed.

On the evening of March 5, 1986, defendant and Tom had an argument during which time the defendant informed Tom of her intent to leave him. Tom, who had been drinking, became very upset and told the defendant the only way she would ever leave him would be "feet first." The next morning the defendant again informed Tom that she was leaving him. Tom became very angry, told the defendant that they would talk later, and left for work.

The defendant stated that upon arriving at Bestom, she worked with Tom for a short while and then decided to go get breakfast. The defendant went into the bathroom and when she came out she noticed Tom standing by the tow motor. Tom hollered for her to come to him. The defendant started walking towards Tom and saw that he had a rug draped over his arm. As she drew closer, she noticed that he was holding a gun underneath the rug. The defendant said when she got close enough, she hit the rug and knocked the gun from his hand. Tom bent over to pick up a hook that was lying on the floor. The defendant picked up the gun and the rug, placed the rug in front of the gun to stifle the noise, and shot twice, striking Tom in the head.

Following further questioning by the police, the defendant gave a third statement, which was taped and played for the jury at trial. In

this statement, the defendant said that she had gone to the bathroom and come back out when Tom hollered for her. She stated that she felt that something was going to happen because of Tom's previous threats. When she saw the rug draped over Tom's arm, she said that she picked up an iron prong and carried it with her to defend herself. The defendant stated that she saw Tom was holding a gun underneath the rug. The defendant knocked the gun away with the iron bar. The defendant picked up the gun and the rug, putting the rug in front of the gun, and fired once at Tom's head. The defendant stated she heard Tom say, "What is happening?" and she fired again. The defendant threw the rug into the office, put the gun in her purse, and left in her car.

When questioned further, the defendant told a final account, which was also taped and played for the jury. In this version, the defendant stated that Tom was in a foul mood, upset because she was planning to leave him. She stated that she wanted to get money from Tom so that she could go and purchase breakfast. Tom told the defendant to stay and answer the phone while he backed a trailer into the terminal. When the defendant came back from the bathroom, she stated she was tired of taking the abuse, she removed a gun from Tom's desk drawer, and she looked to see if it was loaded. The defendant stated that she was not familiar with guns. She said that she cocked the gun, put a rubber glove on the hand in which she held the gun so that she wouldn't get any powder on herself as she had seen on television. She then put the gun in her hand inside the pocket of her blue jacket, picked up a rug, and walked to the tow motor where Tom was working. The defendant stated that she waited until he had stopped, and she then put the rug in front of the gun to stifle the noise. As Tom was getting off the tow motor, she fired a shot towards his head. She stated that Tom turned, started toward her, and she heard him say, "What in the hell ***?" She then fired again and Tom fell to the floor. After the shooting, she threw the rug in the office, took her purse, put on her leather jacket, hung up her blue jacket, put the gun in her purse, and dropped the rubber gloves in the wastebasket in an outer office.

Dr. Grant Johnson, State Pathologist, testified that the cause of death of Tom Fleming was the destruction of the brain. Johnson additionally ran tests on the deceased for drugs and alcohol, finding neither to be present. On cross-exam, the defense attempted to establish that Tom was coming towards or charging the defendant at the time he was shot. Johnson, however, could not substantiate this claim.

Once the State elicited the facts surrounding the murder, they

proceeded to establish a financial motive on behalf of the defendant. The evidence indicated that the defendant took care of all of the financial matters pertaining to the business. The defendant admitted using the business checking account for personal use and making fraudulent entries in the check register. Lawrence Gramke, certified public accountant from Quincy, who was hired to conduct a financial analysis of the business and personal accounts of the Flemings, found some 95 checks which contained discrepancies.

Additionally, Jeffrey Timmons, the divisional manager with the American Freight Company of which Bestom was an affiliate, testified that Bestom had failed to file timely financial statements. Evidence further indicated that the Flemings' property was subjected to a tax sale due to delinquent real estate taxes. The Flemings were also delinquent on a business loan. This loan, however, was paid in full upon Tom's death as he had purchased credit life insurance on the loan.

The defendant testified in her own behalf, highlighting the abusive relationship and reiterating her final version of what transpired on the morning of the incident. The defense introduced a series of photographs depicting the defendant after she had been physically abused. The defendant admitted to being delinquent on loan payments for the home and the business and to falsifying entries in the check register. When the defendant was asked why she shot her husband, she replied, "I guess I was afraid."

Dr. Frank Froman, a clinical psychologist who examined defendant subsequent to arrest, characterized her as a classic battered woman. Froman explained that the defendant was the victim in a battering relationship which caused her to suffer a decrease in self-esteem and a psychological state of "learned helplessness" arising out of her inability to predict or control the violence directed at her. Froman met with the defendant on six occasions for varying lengths of time during which he administered a series of personality and psychological tests.

Froman indicated that the constant mental and physical abuse and the resultant helplessness and despair culminated with Tom's threat to kill the defendant on the day of the shooting. Froman further stated that despite the fact that Tom was not armed or in the act of executing any threat, the defendant had reason to believe that deadly force was necessary to save her own life. Froman stated that up until the point the defendant found a gun, she had no intention and no idea that she was even capable of murder. In addition to fearing for her own life, Froman specifically stated that at the time of the commis-

sion of the crime, defendant did not appreciate the criminality of her act and was unable to conform her conduct to the requirements of law.

On cross-examination, Froman admitted that his opinions were largely based upon the information relayed to him by the defendant and that if the defendant had been lying, his opinion would change.

In rebuttal, the State countered with the testimony of Dr. Robert Chapman, a psychiatrist who examined the defendant. Chapman stated that while the defendant was in fact a victim of the battered wife syndrome, at the time of the exam and at the time of the incident, the defendant was not suffering from any mental disease or defect. Chapman opined that the defendant did not lack substantial capacity to appreciate the criminality of her conduct. Chapman further stated that the defendant had other options besides killing her husband.

At trial, the jury was instructed on murder including the defense of justifiable use of force, voluntary manslaughter including the defense of justifiable use of force, and the definition of the use of force in defense of a person. Additionally, over defense objection, the court instructed the jury:

"A person who initially provokes the use of force against [herself] is justified in the use of force only if

█ the force used against [her] is so great that [she] reasonably believes that [she] is in imminent danger of death or great bodily harm, and [she] has exhausted every reasonable means to escape the danger other than the use of force which is likely to cause death or great bodily harm to the other person." Illinois Pattern Jury Instruction, Criminal, No. 24—25.09 (2d ed. 1981).

The defendant maintains the trial court erred in giving this jury instruction as there was no evidence that the defendant had ever provoked the use of force. While the defendant admits that she could be perceived as the aggressor with respect to the shooting, the defendant argues that the instruction required the jury to give improper emphasis to the fatal act, thereby discounting all evidence preceding the incident.

█ To assess the propriety of a particular jury instruction, it must be viewed in conjunction with all of the instructions given. (*People v. Terry* (1984), 99 Ill. 2d 508, 516, 460 N.E.2d 746, 750.) The series of instructions given, taken as a whole, must fully and fairly announce the applicable law. *People v. Terry* (1984), 99 Ill. 2d 508, 460 N.E.2d 746.

■■ ■ Both the State and the defendant are entitled to instructions embodying their separate theories of the case; evidence supporting a particular theory will justify giving an instruction on it. (*People v. Wilkerson* (1984), 123 Ill. App. 3d 527, 463 N.E.2d 139.) It is error to submit an instruction where no evidence is advanced in support thereof. *People v. Townsend* (1985), 136 Ill. App. 3d 385, 483 N.E.2d 340; *People v. Ellis* (1982), 107 Ill. App. 3d 603, 437 N.E.2d 409.

The defendant sought to establish that the victim was coming toward her when the shooting occurred. The State agreed that the defendant shot the victim once, the victim started toward the defendant, and the defendant then shot the victim again, killing him. The theory of the State with respect to the occurrence and the evidence submitted justify the use of the instruction.

■■■ The aggressor instruction in question states that a person may not provoke the use of force and then retaliate claiming self-defense. This instruction is appropriate and permissible when there is evidence that the defendant provoked the deadly affray. (*People v. Crue* (1977), 47 Ill. App. 3d 771, 362 N.E.2d 430.) The giving of this instruction does not erroneously assume the defendant was the initial aggressor. (*People v. Ellis* (1982), 107 Ill. App. 3d 603, 437 N.E.2d 409.) The question of self-defense, specifically whether the defendant was the initial aggressor, is a question of fact for the jury to decide. Where there is conflicting evidence regarding the issue of self-defense, the jury should be given both the self-defense and the initial aggressor instruction so that they might decide between the conflicting evidence and apply the correct law. *People v. Crue* (1977), 47 Ill. App. 3d 771, 362 N.E.2d 430.

■■ The defense theory of the case at trial was that the defendant was a victim of the battered wife syndrome who killed her husband in self-defense. The battered wife syndrome is a psychological phenomenon suffered by women who are physically and psychologically abused by the dominant male in their life over an extended period of time. (See L. Walker, The Battered Woman (1979).) The battered wife syndrome has more recently developed as a criminal defense theory which seeks to explain the violence of wives directed at their husbands as the product of prior batterings. See *People v. Torres* (1985), 128 Misc. 2d 129, 488 N.Y.S.2d 358; *State v. Allery* (1984), 101 Wash. 2d 591, 682 P.2d 312; *Hawthorne v. State* (Fla. App. 1982), 408 So. 2d 801.

The State, however, continued to maintain that the defendant killed in a deliberate and premeditated manner motivated by financial reasons. The State presented much evidence regarding both personal

and business finances of the Flemings. While the State's expert admitted that the defendant was the victim of the battered wife syndrome, the expert maintained the defendant was sane at the time of the incident and additionally could have escaped rather than killing in self-defense.

■ The State and the defense presented completely different theories of the case. Each, in turn, presented evidence in support of their theory. Consequently, both the State and the defense are entitled to instructions in support of their theories. There was a clear conflict as to whether the defendant was the initial aggressor in the incident. The instructions given, when viewed in sum, were not prejudicial to the defendant in light of the evidence adduced at trial.

At the instructions conference, the State tendered instructions for murder and voluntary manslaughter, including both unreasonable belief and intense passion. Defense counsel objected to instructing the jury on the issue of voluntary manslaughter. The objection, however, was overruled. The jury was also instructed on self-defense, presumption of innocence, and the burden of proof. The jury returned a verdict of guilty of murder following approximately 1½ hours of deliberation.

The defendant maintains that the trial court committed reversible error in not instructing the jury that the burden of proof was on the State to negate the partial affirmative defense of voluntary manslaughter. Although defense counsel failed to object or to tender a more appropriate instruction at the trial court level, the defendant maintains that the doctrine of plain error or, alternatively, Supreme Court Rule 451(c) (87 Ill. 2d R. 451(c)) vitiates application of the waiver rule.

■■ The offense of voluntary manslaughter, whether grounded upon intense passion or upon unreasonable belief, is an included offense of murder. (*People v. Bolden* (1985), 132 Ill. App. 3d 1047, 1057, 477 N.E.2d 1380, 1387, citing *People v. Hoffer* (1985), 106 Ill. 2d 186, 478 N.E.2d 335, *cert. denied* (1985), 474 U.S. 847, 88 L. Ed. 2d 114, 106 S. Ct. 139.) Consequently, when a defendant in a murder trial introduces some evidence of intense passion or of unreasonable belief, it is to be treated as a partial affirmative defense and the burden is on the State to negate the elements of voluntary manslaughter. *People v. Bolden* (1985), 132 Ill. App. 3d 1047, 1058, 477 N.E.2d 1380, 1387.

■■ ■ This court has recently addressed the burden of the State in murder cases, specifically the inclusion of a voluntary manslaughter instruction which states that the State must establish, beyond a reasonable doubt, the elements of murder, which includes ne-

gating any affirmative defense. (*People v. Burns* (1986), 144 Ill. App. 3d 345, 354, 494 N.E.2d 872, 879; *People v. Williams* (1985), 134 Ill. App. 3d 334, 339, 480 N.E.2d 205, 209.) When evidence of voluntary manslaughter is presented and *the defense requests such an instruction*, the court must instruct the jury that the State must negate the mitigating elements of voluntary manslaughter beyond a reasonable doubt in order to permit a guilty verdict on the murder charge. (*People v. Burns* (1986), 144 Ill. App. 3d 345, 494 N.E.2d 872; *People v. Williams* (1985), 134 Ill. App. 3d 334, 480 N.E.2d 205.) The failure of defense counsel to request such an instruction will constitute a waiver unless such instruction is so essential, based upon the particular facts of the case, that the court has the responsibility to give it. *People v. Burns* (1986), 144 Ill. App. 3d 345, 494 N.E.2d 872.

In the case at hand, as in *Burns*, the defendant made no objection, failed to tender an appropriate instruction, and did not allege this issue as error in her post-trial motion. Consequently, the defendant's failure to request a specific instruction regarding the burden of proof with respect to the elements of voluntary manslaughter constitutes a waiver.

Furthermore, we cannot say that plain error occurred. The facts of the case were clear-cut. The defendant admitted killing her husband, but relied upon the battered wife syndrome to substantiate her claim of self-defense. We have reviewed the instructions in their entirety and we have determined that the court fully informed the jury of all of the elements of voluntary manslaughter. The jury was initially informed that the State had the burden of proof. The instructions given did not misplace the burden of proof. There was no indication whatsoever that the jury was confused by the instructions. Consequently, the court's failure to instruct the jury regarding the State's burden of proof with respect to voluntary manslaughter did not constitute a grave error or substantial defect. See *People v. Burns* (1986), 144 Ill. App. 3d 345, 494 N.E.2d 872; *People v. Bolden* (1985), 132 Ill. App. 3d 1047, 477 N.E.2d 1380; *People v. Howard* (1985), 139 Ill. App. 3d 755, 487 N.E.2d 656.

The defendant's final contention is that the trial court violated discovery rules and deprived her of due process of law by conditioning Dr. Froman's testimony upon the disclosure of a written report. Additionally, the defendant claims that the court's failure to grant reciprocal rights with respect to the State's expert denied her due process.

Both the prosecution and the defense filed motions for discovery prior to trial. On April 10, 1986, the defense notified the State that it had engaged Dr. Frank Froman, a clinical psychologist, to examine

the defendant. Thereafter, on May 23, 1986, the defense responded to the prosecution's discovery request. The response included self-defense and temporary insanity as potential defenses and further indicated that the defendant had no reports from any experts in her possession or control.

On May 27, 1986, the State engaged Dr. Robert Chapman to examine the defendant. The same day, the State filed a motion *in limine* indicating that "the defendant had failed to provide the People with any report or summary of the results of any mental examinations or statements of any experts." At the hearing on the motion, defense counsel indicated that he did not have any written reports from Dr. Froman, but that Dr. Froman was available to be interviewed by the State. The court *sua sponte* rejected defense counsel's offer and ruled that the defendant obtain a written statement from the doctor prior to testifying at trial.

The record indicates that Dr. Froman prepared a two-page report which was tendered to the State prior to trial pursuant to the court's order. Froman concluded his report by noting that it was only a "brief summary" of his findings and that he would be "happy to expand on it in any way asked."

At trial, the State used this report to impeach Froman's testimony.

Supreme Court Rule 413(c) provides for the disclosure by the defendant of the reports or results of physical or mental examinations. (87 Ill. 2d R. 413(c).) Subparagraph (d) requires defense counsel to furnish the State with memoranda reporting or summarizing the oral statements of the person he intends to call as witnesses. 87 Ill. 2d R. 413(d).

The rules of discovery exist to prevent surprise and unfair advantage at trial. (*People v. Bailey* (1982), 103 Ill. App. 3d 503, 431 N.E.2d 723.) As a general rule, courts have consistently held that there is no duty for parties to reduce a witness' oral statements to writing absent a showing of bad faith. (*People v. Jackson* (1985), 131 Ill. App. 3d 128, 474 N.E.2d 466; *People v. Mims* (1982), 111 Ill. App. 3d 814, 444 N.E.2d 684.) Additionally, a witness may not be disqualified from testifying simply because the party did not draft memoranda of pretrial, oral statements. *People v. Abbott* (1977), 55 Ill. App. 3d 21, 370 N.E.2d 286.

While the trial judge did have discretion to order pretrial discovery pursuant to supreme court rules, the judge did not have the authority to order defendant's expert to submit a written summary prior to testifying. This error, however, was harmless in light of the

facts and circumstances adduced at trial.

The due process clause of the fourteenth amendment presupposes that discovery is a two-way street, thereby balancing the forces between the accuser and the accused. (*Wardius v. Oregon* (1973), 412 U.S. 470, 37 L. Ed. 2d 82, 93 S. Ct. 2208.) The defendant's argument, however, with respect to the reciprocal rights concerning the expert witnesses was not a violation of due process. Where rebuttal witnesses are concerned, the State need not inform the defendant of the foregoing until the intent to call the rebuttal witness is formed. (*People v. Hine* (1980), 89 Ill. App. 3d 266, 411 N.E.2d 930.) Since Dr. Chapman was called in rebuttal to refute the testimony of Dr. Froman regarding the defendant's mental state at the time of the incident, the State had no duty to inform the defendant of the content of Dr. Chapman's testimony. Additionally, the record shows the defendant's counsel stated with respect to Dr. Chapman's testimony: "I have received no written report from him, and I haven't requested them." The trial court granted defendant's request to interview Dr. Chapman prior to his testifying.

The order of the circuit court is affirmed.

Affirmed.

SPITZ, P.J., and KNECHT, J., concur.