THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANDREW JOHNSON, Defendant-Appellant.

First District (4th Division)   No. 1—89—1665

Opinion filed September 30, 1991.

Michael J. Pelletier and Ann C. McCallister, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Kathleen F. Howlett, Special Assistant State's Attorney, and Renee Goldfarb and Ashley A. Romito, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McMORROW delivered the opinion of the court:

Defendant and Robert McFadden were jointly charged with robbery. McFadden pleaded guilty to the charge. Defendant entered a plea of not guilty. Following a jury trial, defendant was convicted of robbery and sentenced as a Class X habitual offender to six years' imprisonment. On appeal, defendant contends that (1) he was denied his constitutional right to conflict-free counsel; (2) the trial court abused its discretion in denying his motion for a continuance; (3) he was not proven guilty beyond a reasonable doubt; and (4) he was prejudiced by several improper prosecutorial remarks in closing argument.

Defendant argues that the evidence did not prove either that he committed or was accountable for McFadden's commission of the robbery. The record discloses the following.

At trial, Hans Spears (Spears), aged 70, testified that at 5 p.m. on August 21, 1988, he and his wife, Beatrice, and their daughter, Judy, were on their way home from a walk in North Lincoln Park. Spears was 20 to 25 feet ahead of Beatrice and Judy when he noticed two men walking shoulder to shoulder toward him. Spears identified the taller of the men as defendant. As the men came directly toward him, he stepped off the path onto the grass to allow them to pass, but the men stopped. Defendant was standing next to the shorter man and in front of Spears when the shorter man grabbed Spears' shoulder, stated a profanity, and then pulled Spears' gold chain from his neck. Both men then ran toward a viaduct leading out of the park underneath the outer drive.

Spears screamed and ran after the men. He fell, got up, and resumed his chase of the men. Judy was approximately 20 feet behind her father. As he was running, he saw a police car and called for assistance. The police apprehended both men and, a few minutes later, returned the chain to Spears. On cross-examination, Spears stated that defendant did not touch or say anything to him, nor did the men speak while in Spears' presence.

Judy Spears testified that she and her parents were approaching an underground tunnel leading from the park to Marine Drive. By the time she reached the passage to the tunnel, she saw her father on the ground. He said "they got my chain, Judy, go after them." She saw two men running and began to chase them, calling for assistance as she ran. The taller man, whom she identified as defendant, had something in his hand. Assuming that the object he held was the chain, she followed him rather than the shorter man, who continued running up a different street. Defendant tried to run between some buildings, but returned to the street when he encountered a dead end. She was approximately 25 feet behind him when he threw the chain into a bushy area. By the time defendant reached the end of the block, the police had arrived and arrested him. After a brief search, she and a policewoman found her father's chain and returned it to him. She did not witness the robbery or see the transfer of the chain from the shorter man to defendant.

Beatrice Spears testified that she saw her husband "being accosted by two men," one of whom she identified as defendant. She saw her husband running and then fall, and she heard him screaming "they got my chain." He arose and resumed his chase of the men. As Judy joined the chase, Beatrice also began running and calling for help. She waved down a police car, explained what had occurred and entered the car. When they caught up with Spears a half-block farther, Beatrice exited the car and Spears entered the back seat. She followed the car on foot and saw that two other squad cars had arrived. The police apprehended defendant and the other man. On cross-examination, Beatrice stated that she did not witness the men taking the chain from her husband and that she was first alerted to the incident when she saw her husband fall and heard him screaming that the two running men had taken his chain.

Chicago police officer Steve Murphy testified that he was on routine patrol on Marine Drive when he was flagged down by a motorist. Following a brief conversation, he drove to a street where he was waved down by Beatrice Spear, who informed him that her husband had just been robbed by two men. She entered the car and

pointed out Spears running westward. When they stopped, Spears entered the car and they proceeded to where Officer Murphy observed two men walking very rapidly northbound. Spears identified them as the men who had robbed him. Officer Murphy "cut these two men off" with the squad car and was able to stop and arrest the taller man, whom he identified as defendant. The other man went in another direction but was apprehended moments later by other officers. The chain was recovered from the area where Judy informed police she had seen defendant throw it.

Defendant asserts that even when viewed in the light most favorable to the State, the evidence established nothing more than his presence at the scene of the robbery, and that mere presence is insufficient to support a conviction under the law of accountability. He argues that there was no evidence that he "was acquainted" or had a "prior connection" with McFadden, that aside from walking together, he and McFadden were "interacting" prior to the robbery, that he said anything to McFadden or Spears before or during the robbery, or that he in any other way participated in it. Defendant maintains that his only actions in this incident were running from the scene and throwing away the chain that McFadden had handed him as they were running, both of which he did out of fear of being accused of participation in the robbery. He argues that this conduct, which occurred after the commission of the crime, does not render him legally accountable for the robbery itself.

A person is legally accountable for another's criminal conduct when "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." (Ill. Rev. Stat. 1989, ch. 38, par. 5—2(c).) Mere presence at the scene of a crime does not render an accused accountable for the offense. (*People v. Gilbert* (1990), 194 Ill. App. 3d 184, 550 N.E.2d 1183.) Nevertheless, "[a]ctive participation has never been a requirement for the imposition of criminal liability upon the theory of accountability" (*People v. Reid* (1990), 136 Ill. 2d 27, 61, 554 N.E.2d 174, 190); nor are words of agreement essential to show a common purpose to commit the unlawful conduct (*People v. Reid*, 136 Ill. 2d at 62). If the evidence shows that the person was present at the crime without disapproving or opposing it, the trier of fact may infer that he assented to the commission of the crime and thereby aided and abetted it (*People v. Reid*, 136 Ill. 2d at 62; *People v. Tinoco* (1989), 185 Ill. App. 3d 816, 541 N.E.2d 1198).

■■ In addition to a defendant's presence at the scene of the crime without any negative reaction to it, other factors raise inferences that an accused aided in its commission. (*People v. Reid*, 136 Ill. 2d at 61.) Some of those factors are: flight from the scene (*People v. Dotson* (1986), 143 Ill. App. 3d 135, 492 N.E.2d 903); continued association with the perpetrator after the criminal act; failure to report the incident (*People v. Reid*, 136 Ill. 2d at 62); acceptance of illegal proceeds from the actual perpetrator which the accused knew did not belong to that person (*People v. Clayborn* (1990), 194 Ill. App. 3d 1079, 551 N.E.2d 1050); and the subsequent concealment or destruction of evidence (*People v. Ruiz* (1982), 94 Ill. 2d 245, 447 N.E.2d 148; *People v. Watts* (1988), 170 Ill. App. 3d 815, 525 N.E.2d 233).

According to the testimony presented at trial in this case, defendant and McFadden approached Spears walking side by side. They simultaneously stopped directly in front of him as Spears was stepping off the path to allow them to pass. McFadden then grabbed Spears' shoulder, demanded the chain and pulled it from Spears' neck. Defendant did not say or do anything to intervene or otherwise express his disapproval or opposition to McFadden's actions. The joint manner in which defendant and McFadden approached Spears and stopped in front of him, together with defendant's failure to intervene or voice any opposition to McFadden's actions, is sufficient to establish that he assented to and aided McFadden in the commission of the robbery.

Additionally, defendant does not deny that he and McFadden immediately fled from the scene, running together into the viaduct and onto the street beyond it with all three members of the Spears family in pursuit and calling for bystander assistance. It is also undisputed that at some point during their flight from the scene, McFadden gave defendant the gold chain taken in the robbery of Spears and that just before being apprehended by the police defendant threw it into some bushes. It has been stated that for purposes of determining legal accountability, the crime is not completed until the offender has escaped from the scene. *People v. Johnson* (1973), 55 Ill. 2d 62, 302 N.E.2d 20; *People v. Gil* (1984), 125 Ill. App. 3d 892, 466 N.E.2d 1205.

Thus, contrary to defendant's characterization of his involvement as being solely in possession of proceeds from a fully concluded robbery in which he did not participate, the criminal conduct here was ongoing. Defendant was fleeing from the scene of a robbery, in which he acquiesced, with the proceeds of that robbery,

which he disposed of immediately before his apprehension. As stated above, it is proper for the trier of fact to consider such conduct in determining defendant's guilt under the theory of accountability. (See, *e.g., People v. Clayborn,* 194 Ill. App. 3d at 1082; *People v. Dotson,* 143 Ill. App. 3d at 142.) The record evidence before us was more than ample to prove defendant guilty of the robbery on the theory of accountability beyond a reasonable doubt.

We next consider defendant's contention that he was denied his constitutional right to conflict-free counsel. He argues that the public defender was laboring under a conflict of interest which arose when, at defense counsel's request, counsel's supervisor advised McFadden concerning the implications of testifying at defendant's trial.

The record shows that on the date trial commenced, defense counsel, Assistant Public Defender King, informed the court that defendant wanted codefendant, McFadden, who had pleaded guilty to the robbery, to testify on defendant's behalf, but that McFadden refused to speak to King about the case. King requested that McFadden be brought back to the courthouse the following day, and that McFadden's private defense attorney be advised that King might serve compulsory process on McFadden. King also expressed his belief that it might nevertheless be impossible to compel McFadden to testify. Defendant personally interjected his disagreement and requested that the court subpoena McFadden and, as will be discussed further below, to also appoint a bar association attorney to replace King. The court ordered that McFadden remain at the jail so as to be available to testify.

Later that afternoon King advised the court that McFadden had changed his mind and indicated he would testify. King again asked the court whether he should advise McFadden's attorney of the situation. The trial court responded "certainly." Trial then commenced, and after the State rested, King stated that he did not anticipate calling any witnesses. Defendant once again addressed the court personally, stating that he wanted McFadden to testify. King explained that it was his strategy decision not to call McFadden because his testimony would be "clearly detrimental to [defendant]." King explained that following his arrest, McFadden denied any involvement in the robbery but then entered a plea of guilty and a stipulation and agreement that both he and defendant had committed the robbery. In the conversation with King on the day of trial, however, McFadden once again asserted his innocence, maintaining that he pleaded guilty because he was afraid of a harsher sentence

if he were tried and found guilty. Defense counsel opined that because McFadden made several statements "diametrically opposed to one another," said anything that came to his mind, and was immature and unrealistic concerning the situation, he should not testify at defendant's trial.

Defendant requested that McFadden be brought into court and asked if he wished to testify. While awaiting McFadden's arrival, King advised the court that McFadden's former attorney had been advised of McFadden's possible testimony but the former attorney wanted no further involvement with McFadden. In response to questioning by the court, McFadden stated that he wanted to tell the truth but would not testify if doing so could hurt him, such as by causing him to "get *** more time on something." McFadden was excused, following which King reiterated that even if McFadden had unequivocally expressed his desire to testify, he, King, would not call him as a witness for the previously explained reasons.

Defendant then accused King and another assistant public defender of "scaring" McFadden by telling him that by testifying he could receive additional prison time. King responded that since McFadden's former attorney refused to counsel McFadden, and because he, King, felt it inappropriate to do so, he asked his supervisor to advise McFadden of his fifth amendment rights. King expressed his belief that McFadden would give perjured testimony, noting McFadden's numerous conflicting statements, but stated that his supervisor merely "advised McFadden of his right, period."

■■ We see no conflict of interest in defense counsel King's conduct or in the fact that he requested his supervisor to advise McFadden of his rights. First, King affirmatively stated to the court that his supervisor did nothing more than advise McFadden of his fifth amendment rights. Moreover, even assuming that McFadden was warned about the consequences of perjuring himself, we fail to see how that fact raises a conflict. Contrary to defendant's argument that "the Office of the Public Defender was more concerned with the possibility of perjury charges against McFadden" than with "champion[ing] the interests of [defendant]," the record indicates that defense counsel was concerned about the detrimental effect on defendant's case if McFadden gave perjured testimony. Counsel noted that the State would capitalize on McFadden's prior inconsistent and conflicting statements to the police and his guilty plea, which included a stipulation of defendant's involvement. We see no conflict of interest in defense counsel's request that McFad-

den be advised of his constitutional rights; nor do we see anything in counsel's conduct which conflicted with defendant's best interests.

Although it is recognized that an accused has the ultimate authority to make decisions concerning whether or not to enter a plea of guilty, testify in his or her own behalf, waive the right to a jury trial, and appeal (*Jones v. Barnes* (1983), 463 U.S. 745, 77 L. Ed. 2d 987, 103 S. Ct. 3308; *People v. Campbell* (1984), 129 Ill. App. 3d 819, 473 N.E.2d 129; *People v. Wilkerson* (1984), 123 Ill. App. 3d 527, 463 N.E.2d 139; *People v. Hunt* (1981), 100 Ill. App. 3d 553, 426 N.E.2d 1268), it is also well settled that an attorney must take professional responsibility for the conduct of the case after consulting with his client. (*Jones v. Barnes* (1983), 463 U.S. at 753 n.6, 77 L. Ed. 2d at 995 n.6, 103 S. Ct. at 3314 n.6.) The attorney is the "manager" of the case (*People v. Wilkerson*, 123 Ill. App. 3d at 532), and, therefore, strategic and tactical decisions are within the exclusive province of trained counsel, who possesses the superior ability to make them (*People v. Campbell*, 129 Ill. App. 3d at 821). Decisions concerning whether to offer certain evidence or call particular witnesses who, in counsel's judgment, may have a harmful effect on the defendant's case are within the realm of trial strategy and ordinarily will not serve as a basis for a claim of ineffective assistance of counsel. *People v. Barrow* (1989), 133 Ill. 2d 226, 549 N.E.2d 240.

In the instant case, defense counsel was adamant that McFadden's testimony would be detrimental to defendant's case and stated for the record his reasons for that conclusion. (See *People v. Hunt* (1981), 100 Ill. App. 3d at 557.) After reviewing the record, we find no fault with counsel's decision. Even if McFadden had testified that defendant was not involved in the robbery, as defendant apparently expected, we note again that cross-examination would unquestionably have brought out McFadden's inconsistent and conflicting statements and his guilty plea in which he expressly inculpated defendant. The trial judge observed that "there is no question that if Mr. McFadden waives his fifth amendment right in the courtroom it would have a very negative impact upon the trial of [defendant]." Finally, notwithstanding defendant's unsupported assertion that defense attorneys admonished McFadden not to testify, the fact remains that McFadden "vociferously," in the trial court's words, stated that he would not testify.

There is no indication in this record that defense counsel was laboring under a conflict of interest which served as a basis for his

refusal to call McFadden as a witness. The decision was one of strategy based on counsel's assessment of McFadden's credibility and demeanor, and his reasoned opinion that McFadden's testimony would be harmful to defendant's case.

Defendant also contends that the trial court abused its discretion in denying his request, made on the morning of trial, for a continuance. Defendant argues that because defendant and defense counsel met to discuss his case for the first time that morning, counsel's "lack of preparation made it impossible for him to adequately represent [defendant]."

Matters relating to continuances in criminal cases are addressed in section 114—4 of our criminal code. (Ill. Rev. Stat. 1989, ch. 38, par. 114—4.) That statute enumerates certain specific circumstances which may justify granting a defense motion for a continuance (Ill. Rev. Stat. 1989, ch. 38, par. 114—4(b)), but also requires a showing of diligence on the part of the movant (Ill. Rev. Stat. 1989, ch. 38, par. 114—4(e)). The decision whether to allow a continuance necessarily depends on the facts and circumstances surrounding each request (*People v. Finklea* (1989), 187 Ill. App. 3d 610, 543 N.E.2d 536), and rests within the sound discretion of the trial court (Ill. Rev. Stat. 1989, ch. 38, par. 114—4(e); *People v. Young* (1989), 128 Ill. 2d 1, 538 N.E.2d 453).

A conviction will not be reversed by a reviewing court because of the denial of a continuance, unless the denial resulted in prejudice to the defendant. The burden of establishing such prejudice is on the defendant. If the ground for the continuance was to enable counsel to prepare for trial, but the record shows that trial counsel nevertheless competently represented the defendant throughout trial, no abuse of discretion will be found. *People v. Finklea*, 187 Ill. App. 3d at 612.

Defendant asserts that a continuance should have been granted because defense counsel King was unprepared for trial. However, the record shows that the matter of a continuance was raised on the morning trial was to begin when defense counsel advised the court that McFadden would not speak to him about the case and that it might be impossible to force McFadden to testify. Defendant interjected his disagreement and requested that the court subpoena McFadden and appoint a bar association attorney in King's stead because he and King were not "getting along on this case." The court advised defendant that the case was ready for trial and that he viewed his request for a different attorney as a delaying tactic. Defendant replied "[w]e can go to trial then." The court ordered

that defendant be held in custody so as to consult with King over the lunch break and decide whether to proceed to trial or move for a continuance. Later that day, defense counsel advised the court that he had discussed the case with defendant for five hours but still felt it his responsibility to request a continuance for the purpose of allowing defendant to obtain counsel with whom he would "feel more comfortable." The trial court indicated that trial would begin the next day. Defendant persisted in his request for appointment of a bar association attorney, which the trial court explained was a practice long ago discontinued in Cook County. The court further advised defendant that he was free to retain any lawyer he chose, as long as that lawyer appeared for trial the following morning.

■ Thus, the record establishes that the request by King for a continuance was based on defendant's disagreement with King about trial strategy and personality differences, and not because King was unprepared. Further, we find nothing to support an assertion that King was unfamiliar with the case. The record reveals that King appeared to present a motion for a continuance by agreement approximately six weeks before trial, and, as noted above, spent at least five hours discussing the case with defendant the day before the case was tried. Additionally, a review of the entire trial transcript belies defendant's assertion that defense counsel was unprepared for trial. That defendant was convicted was not due to lack of preparation, competency or advocacy by counsel on defendant's behalf, but on the strength of the evidence against defendant. The trial court did not abuse its discretion in denying defendant's motion for a continuance based upon his dissatisfaction with appointed counsel. See *People v. Hall* (1986), 114 Ill. 2d 376, 499 N.E.2d 1335; *People v. Lewis* (1988), 165 Ill. App. 3d 97, 518 N.E.2d 741.

Defendant's final contention is that the State made certain inflammatory and prejudicial remarks and misstated the jury's function and the law of accountability during closing argument. He asserts that these comments resulted in substantial prejudice and entitle him to a new trial.

Although defense counsel interposed several objections during the State's case and its closing argument, no objections were made to the specific remarks challenged on appeal. Also, the motion for a new trial refers only to "prejudicial and erroneous statements *** designed to arouse the prejudice and passions of the jury" without specifying what the remarks were or in what manner they preju-

diced him. Failure to object at trial to allegedly improper remarks made by the State or to raise those objections with reasonable specificity in a post-trial motion generally constitutes a waiver of any error on appeal (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124; *People v. Smith* (1985), 139 Ill. App. 3d 21, 486 N.E.2d 1347), unless the remarks were so egregious and prejudicial that they constituted a material factor in the defendant's conviction or otherwise prevented him from receiving a fair trial. *People v. Johnson* (1986), 114 Ill. 2d 170, 499 N.E.2d 1355; *People v. Lasley* (1987), 158 Ill. App. 3d 614, 511 N.E.2d 661.

Defendant contends that the prosecutor attempted to arouse the jury's antagonism and to incite racial prejudice against him by pointing out that defendant, who is African-American, lived on the south side of Chicago and that the crime occurred a substantial distance away from defendant's home, in North Lincoln Park; and by stating that there was "no reason for him to be there except to cause trouble, to look for some victim." The prosecutor concluded with the statement, "you decide whether to protect your streets, your community from [defendant]." Defendant maintains that the implication of this argument was that "a public park on the north side of Chicago is or should be off limits to a black man from the south side of Chicago," and that urging the jury to protect "their" community was an appeal to the juror's racial bias.

Very similar remarks were challenged in *People v. McKay* (1985), 138 Ill. App. 3d 446, 452, 485 N.E.2d 1257, where the defendant, an African-American, was convicted of a burglary in a distant western suburb of Chicago. In closing argument the prosecutor remarked:

"It's clear from the evidence, *** the only inference that can be drawn is this man didn't belong in that area.

You heard the testimony of where he lives. He doesn't live in that area. He lives on the southside of Chicago."

The court rejected the defendant's contention that the prosecutor was attempting to arouse racial fear and animosity by arguing that African-American people did not belong in that suburb and, if there, their only purpose must be to commit a crime. The court found that the prosecutor simply noted that defendant, without any comment on his race, did not live in the area where the crime occurred and did not apparently have a valid reason to be in the area of the burglary on the evening in question, and that this was a proper comment on the facts presented. See also *People v. Montague* (1986), 149 Ill. App. 3d 332, 500 N.E.2d 592 (vague reference

to witnesses from a certain section of the city did not contain any direct racial slurs and was a logical inference based on the evidence presented).

●4 Like the court in *McKay*, we do not view the State's remarks as an improper appeal to racial prejudice. The defense position was that defendant's presence in the park with the person who committed the robbery was mere coincidence. The prosecutor attempted to counter that theory by pointing out that the particular park where the crime occurred was on the opposite side of the city from where defendant lived. Further, the State's remarks that defendant was there to cause trouble and to look for some victim were reasonable inferences from the evidence presented.

Neither do we agree with defendant's interpretation of the prosecutor's reference to the protection of "your streets, your community from [defendant]" at the conclusion of argument as meaning the protection of "white neighborhoods" from African-American persons. The prosecutor commenced the opening argument by noting that everyone in the courtroom was from the "Chicago area," that there were numerous recreational areas and activities throughout the city, and that all persons should have the freedom to enjoy these places and activities without fear. The prosecutor's concluding statement was merely an extension of that theme. It is not improper for the State to comment unfavorably upon the defendant or to urge the fearless administration of the law. *People v. Lasley*, 158 Ill. App. 3d at 633.

*People v. Nightengale* (1988), 168 Ill. App. 3d 968, 523 N.E.2d 136, on which defendant relies, is clearly distinguishable. There are obvious differences between the egregious conduct and argument of counsel in *Nightengale* and that of the prosecutors in the case before us.

■ Defendant also argues that the State improperly misstated the function of the jury by aligning the jury with the State and its witnesses. Defendant challenges the prosecutor's statements that "[the witnesses] had the courage to come in and testify for the same reason you are here and that is to see that justice is done." Defendant has not cited, nor have we found, any case holding that it is a misstatement to say that the purpose of and one's participation in a criminal trial is to seek justice. In *People v. Smith* (1990), 199 Ill. App. 3d 839, 557 N.E.2d 596, an argument that the victim depended upon the jury for justice was held to be a permissible urging of the fearless administration of justice. In *People v. Emerson* (1987), 122 Ill. 2d 411, 522 N.E.2d 1109, the prosecutor's remark

that he had the responsibility to seek justice was merely an explanation of the prosecutor's function in the criminal justice system. In the case at bar, when the prosecutor's statement is examined in context, the State's remark was not focused on the function of the jury, but on the credibility of the witnesses.

■ Defendant also argues that the prosecutor improperly attempted to confuse the jurors regarding their role by telling them that "in this case you are the People of the State of Illinois." Once again, no objection was made to this comment. We do not believe that this comment misled the jurors as to their function, on which they were adequately instructed, or that it was a perversion of the principle that a jury is a nonpartisan body. Rather, when considered in the context of the State's argument in its entirety, we interpret it to be additional urging by the prosecutor that the jury fearlessly administer the law. See *People v. Smith*, 199 Ill. App. 3d at 855.

■ Defendant's final claim of error is that the prosecutor misstated the law of accountability. Defendant argues that the State distorted the State's burden of proof by incorrectly and prejudicially advising the jurors, through an erroneous analogy, that a person was accountable for the crime if he accepted any of the proceeds after its commission.

Although mere acceptance of the proceeds of a crime does not, standing alone, render a person accountable for the crime, knowing acceptance of stolen property is one of several factors which, as noted above, may be considered by the trier of fact as circumstantial evidence in determining whether defendant is guilty under the law of accountability. (*E.g., People v. Clayborn* (1989), 194 Ill. App. 3d at 1082.) We do not view the prosecutor's argument as improper. Moreover, we note that both the prosecutor and defense counsel quoted the statutory definition of accountability, which refers to the defendant's conduct "before or during the commission of an offense," and the definition was repeated in the court's formal instructions, which the jurors were advised they were obligated to follow. Consequently, any misstatements of law and potential prejudice therefrom were adequately cured by the arguments and the jury instruction correctly defining the law of accountability. See *People v. Lasley*, 158 Ill. App. 3d at 626.

For the reasons stated, defendant's conviction is affirmed.

Affirmed.

JIGANTI, P.J., and JOHNSON, J., concur.