City of Chicago, Plaintiff-Petitioner-Appellee, v. Hart Building Corporation, et al., Defendants, Richard A. Keefe, Respondent-Appellant.

Gen. No. 51,979.

First District, Second Division.

October 21, 1969.

Thomas W. McNamara and Clarold L. Britton, of Chicago (Raymond, Mayer, Jenner & Block, of counsel), for appellant.

Raymond F. Simon, Corporation Counsel of City of Chicago (Marvin E. Aspen and Ronald S. Cope, Assistant Corporation Counsel, of counsel), for appellee.

MR. PRESIDING JUSTICE LYONS delivered the opinion of the court.

Richard A. Keefe, the respondent in a contempt proceeding, appeals from a decree finding him guilty of contempt and imposing a fine of $5,000 and additional penalties which will be discussed later in this opinion. In this appeal, the respondent attacks the jurisdiction of the trial court, the sufficiency of the evidence, particularly with

regard to the element of criminal intent and the severity of the punishment.

In 1959 the City of Chicago (hereinafter referred to as the City) filed numerous suits against various corporations owned and controlled by Jack and Jules Winkler seeking to correct Building Code violations in a group of twenty properties owned by the corporations. In 1963 the City petitioned the court for the appointment of a receiver to correct these violations since the Winklers had not cooperated. In February, 1963, Keefe was appointed receiver for fourteen of these properties and was given directions to take possession of the premises; preserve the properties; collect the rents; and with the prior authorization of the court, borrow money and encumber the buildings so that the borrowed funds could be used to repair the structures and bring them into compliance with the Building Code of Chicago. These were the only express powers given to the receiver. Keefe's receivership period extended from 1963 to March, 1964, as to one of the four properties involved in this appeal and from 1963 to July, 1965, as to the other three properties. On these latter dates, Keefe filed his final report and account as receiver for the specific property or properties involved; received court approval of his final account; and was discharged as receiver for each of these properties. During his period of receivership, three of the four buildings were demolished pursuant to court order.

In three of his final reports, Keefe represented under oath that the present owner of the property was a financial institution, naming the bank, which held legal title as trustee under a land trust, giving the trust number. In the fourth report, Keefe represented under oath that Austin Carter was the present owner. In all of these final reports, Keefe recommended, again under oath, that possession of the premises be taken from him as receiver and given immediately to the new owner.

42

On November 3, 1965, after Keefe had been discharged as receiver of the four properties involved in this appeal, the City filed its verified petition for disclosure alleging that Keefe was appointed receiver of the enumerated properties in February, 1963; that he went into possession and managed the premises thereafter; that during the period of his receivership a fiduciary relationship existed between the City of Chicago, the Hart Building Corporation, the court, and Keefe, as receiver; and that it was unable to determine from the facts available to it if Keefe, as receiver, had breached this fiduciary relationship. The petition closed with a prayer that the court enter a rule on Keefe, as receiver, requiring him to make a complete disclosure of his interest in and to each and every piece of property entrusted to him as receiver from the date of his appointment to the date on which this petition for disclosure was filed.

In response, Keefe filed a special appearance and motion to strike alleging, inter alia, that the court had no jurisdiction over him or the subject matter since his final reports and accounts had been approved after due notice to all interested parties and the court had discharged him as receiver. Keefe also alleged that the petition for disclosure was an improper pleading since it could not be regarded as ancillary to any pending proceedings.

After a hearing, this motion to strike was denied and Keefe was ordered by the court to make a full disclosure in writing and under oath. After he had filed a statement and a supplemental statement, both of which were rejected by the court as being incomplete, Keefe presented his amended statement in which he stated, under oath, that on or about November 6, 1963, which was after he had been appointed receiver, his attorney, unnamed, had executed a written contract of purchase with one Harry Eager concerning three of the four properties involved in this litigation; that Eager was the holder

of the first mortgage on each of these properties and had instituted foreclosure proceedings against them; and that Keefe, through this unnamed attorney, was to purchase Eager's interests therein. The amended statement went on to mention that Keefe did not acquire title from himself as receiver or through any proceedings in the receivership but rather that Harry Eager was the successful bidder at the various foreclosure sales and that Keefe paid Eager in exchange for the delivery of Eager's master's deed to each one of the three properties. In addition, a judgment creditor of one of the corporations owned and controlled by the Winklers had exercised its equity of redemption pertaining to one of the properties involved in the foreclosure sales and Keefe had to pay it a certain sum for its interest therein, as well as purchasing the tax deed interest of another party who had been the highest bidder in a tax foreclosure sale applicable to another one of the properties which had been involved in the foreclosure proceedings. Keefe admitted that in time the legal title to these three properties passed into three land trusts in which he was the sole beneficiary and that he had paid exactly $41,529.80 to acquire these three properties.

As for the fourth property involved in this appeal, Keefe admitted that the first mortgagee, Lincoln Park Federal Savings and Loan Association, also had foreclosed and that Keefe's agent and nominee, Austin Carter, was the highest bidder ($15,000) at the foreclosure sale, after which Carter passed the legal title to a land trust in which one Gene Byrne was the sole beneficiary but he, Keefe, held a partnership interest therein. In conclusion, Keefe denied that he had violated his duties as receiver or any fiduciary relationship but admitted that he had paid the Winkler brothers, through their attorney, the sum of $15,000 "for their peace herein although they had no equity interest." The total sum which Keefe apparently paid for these four properties was $71,527.80.

After this amended answer was filed, lengthy evidentiary hearings were held on many occasions. A transcript exceeding 1,600 pages has been filed in this court. Eighteen witnesses testified and more than thirty exhibits were received in evidence. The chief witnesses for the City were Harry Eager; Jack Winkler; Marvin Patrick Cohen, attorney for the Winklers; Austin Carter; and Gene Byrne. Keefe was served with a subpoena but the City, apparently recognizing that the privilege against self-incrimination is applicable to the type of contempt proceedings involved in this appeal, did not compel him to testify. Keefe did not testify in his own behalf. The defense presented no witnesses.

Harry Eager testified that he was a mortgage broker operating under the name of Illinois Mortgage Company, a sole proprietorship, and that on November 6, 1963, he sold his mortgage interests in three of the instant properties to an attorney, Harold Ginsburg, who was referred to in the written contract as "Ginsburg or his nominee." After the contract was signed, Eager asked Ginsburg if Keefe was interested in the purchase and received an affirmative reply. The signed, written contract between Eager and Ginsburg was admitted into evidence. It provided, among other things, for the continued use of Eager's name as plaintiff in all of the pending mortgage foreclosure proceedings if Ginsburg or his nominee so requested.

Jack Winkler testified that in February, 1964, he had a meeting with Keefe and Winkler's attorney, Marvin Patrick Cohen, in the latter's office at which time Keefe told Winkler that he would pay Winkler $35,000 if he would not attend the foreclosure sales pertaining to three of the four properties involved in the instant appeal. Payment was to be $5,000 in cash payable every thirty days beginning in March, 1964. Winkler agreed to this oral proposal, received $5,000 a month in cash from March through June, 1964, never attended the foreclosure sales at which

Eager was the successful bidder, and maintained that Keefe still owed him $20,000 based upon his oral promise. Winkler's attorney, Cohen, corroborated much of this testimony.

Austin Carter stated that he was a real estate broker in Chicago; that he had known Keefe for more than four years; that he had acted as nominee for Keefe at the latter's request in the purchase, at a foreclosure sale, of one of the properties involved in this appeal; that he did not know that Keefe was the receiver for the building at the time of the foreclosure sale; that thereafter he conveyed legal title by way of a land trust to a bank with Gene Byrne as beneficiary; and that he had used Keefe's money to purchase the property.

Gene Byrne testified that he was a real estate salesman in a corporation owned and controlled by Keefe; that he was the beneficiary of a land trust relating to one of the properties involved in this appeal but that he had paid no consideration for his interest; that Keefe had paid for the property using Carter as Keefe's nominee at the foreclosure sale and Byrne as his nominee in the land trust transaction; that there was an oral agreement between him and Keefe specifying that Byrne's interest in the trust was to be 5% and Keefe's was to be 95%; and that Keefe used this land trust device to conceal his ownership in various properties on North Wells Street in Chicago since he was purchasing quite a bit of property in the area in an attempt to put together a large redevelopment and did not want the selling price of the available properties to become inflated.

After this testimony was completed, the court directed the City to prepare a petition for rule to show cause why Keefe should not be held in contempt of court for his actions in acquiring, during the period of his receivership, receivership property for his own personal ownership without disclosing this to the court. Keefe filed an answer to this petition denying any guilt. Both parties to this

46

litigation also filed briefs in the trial court supporting their side of the case.

After all the evidence had been taken and the answer to the petition for rule to show cause had been filed, the City was given leave to file instanter, over Keefe's objection, an amendment to its petition for disclosure so as to conform the pleadings to the proof. The earlier petition for disclosure was thereby amended to include the allegations that Keefe acquired title to enumerated receivership property, without disclosure to the court, while still acting as receiver; that Keefe thereby breached the fiduciary relationship existing between the court and himself, as receiver; that the final orders discharging him as receiver for the four properties involved in this appeal be vacated pursuant to section 72 of the Civil Practice Act; that Keefe be held in contempt of court for his actions; and that the court enter an appropriate fine or penalty. Thereafter, the court simultaneously filed a lengthy opinion giving its reasons for holding Keefe in contempt of court and a decree vacating its earlier orders which had discharged Keefe as receiver for the four properties involved in this litigation; holding Keefe to be in contempt of court; and setting forth the penalty to be paid by Keefe for his actions.

In addition to a $5,000 fine, the court ordered Keefe to file, under oath, a certified accounting, supported by cancelled checks, vouchers, and other necessary documents, showing all the costs and expenses incurred by him in acquiring four properties for his own use and ownership while allegedly still acting as receiver. Certified appraisals were to be made as of the date of the decree by three appraisers: one employed by Keefe; one by the City; and one by the court. The court was then to compare acquisition costs with appraisal value and order a judicial sale as to those properties whose appraised value exceeded Keefe's acquisition cost. The excess of appraisal value over acquisition cost was to constitute an ad-

ditional fine to be paid by Keefe to the Clerk of the Court. If the acquisition cost for some of these four properties exceeded the appraisal value, the court would not order a judicial sale of the property but would apply this unrealized loss against the additional fine imposed on Keefe, if any, and he would then pay the net figure to the Clerk of the Court. Keefe appeals from this final decree.

The respondent's initial contention is that the trial court did not have jurisdiction to entertain the City's petition for disclosure, which the respondent correctly characterizes as an equitable bill of discovery, because the petition was not ancillary to and in aid of any pending civil suit at law. Instead, the petition is said to be ancillary to a contemplated criminal contempt proceeding. From this basic premise, the respondent urges that since the trial court never had jurisdiction, all of the subsequent proceedings and orders entered were void and of no effect. Such an argument overlooks the point that the City was compelled to commence the action in this unusual way because of the subterfuge employed by the respondent as he attempted to conceal, through the use of nominees, agents, and land trusts, his self-dealing in receivership property without disclosure to the court.

██ It is apparent from this record that the respondent was thoroughly familiar with the real estate field in which he was employed and that he attempted to take advantage of his knowledge for a forbidden purpose. For example, it is a matter of common knowledge that trustees holding legal title under a land trust will not disclose the identity of the beneficiary of such a trust. In the case at bar, the legal title to all four properties was held in separate land trusts. The City could not have ascertained the identity of the beneficiary when it was discovered, through the examination of public records, that the properties were held in trust. Furthermore, the public records applicable to these four properties did not

disclose that Keefe, the respondent, was the purchaser at the respective foreclosure sales since he was clever and careful enough to use nominees in a successful effort to conceal from the public, the City, and the court his self-dealing in receivership property. To sustain the respondent's contention in this regard would be to enable him to profit from his own wrongs. Within the unusual facts of this case, we hold that no error was committed when the City commenced these proceedings with its petition for disclosure, thereby compelling Keefe to produce the necessary information.

 Secondly, the respondent contends that he was found guilty of criminal contempt of court but that the evidence was insufficient to convict in that the element of criminal intent was never proved beyond a reasonable doubt. Moreover, Keefe urges that he violated no fiduciary duties in the acquisition of these properties because he acquired title at judicial sales and not from himself during the receivership period. He also contends that no person interested in the properties as owner, mortgagee, or otherwise is complaining of his conduct as receiver, and he had no duty to disclose his ownership to the court in his final reports since none of the express powers given to him as receiver by the court related to ownership. Although we agree with the respondent that this proceeding does involve a criminal contempt of court, since it was alleged that a fraud had been practiced upon the court thereby affecting the preservation of its dignity and authority, and that the burden of proof in such criminal contempt cases must be beyond a reasonable doubt as to both act and intent (People ex rel. Chicago Bar Ass'n v. Barasch, 21 Ill2d 407, 412, 173 NE2d 417, 420 (1961), United States v. Kroger Grocery & Baking Co., 163 F2d 168, 174 (7th Cir 1947)), we hold that the evidence in this case overwhelmingly shows that the respondent acted knowingly, intentionally, and wilfully. It is difficult to conceive how else we can regard a man's actions in which

he uses nominees, agents, and land trusts to conceal his individual ownership of receivership property acquired during the time of his receivership period and then files false final reports with the court so as to gain his discharge and hopefully avoid any further detection.

It stands undisputed in this record that Keefe used Ginsburg to buy Eager's first mortgage interest in three of the properties; used Eager to foreclose on these properties as the nominal plaintiff whereas Keefe was the real party in interest; used Carter and Byrne to conceal his ownership in the fourth property; paid Jack Winkler $15,000 in an obvious attempt to keep him from bidding at the foreclosure sale; and filed false final reports with the court failing to disclose that he was the real titleholder. Indeed, many of these actions are admitted in the pleadings, particularly Keefe's amended statement. Furthermore, Gene Byrne, one of the witnesses at the evidentiary hearings, stated that Keefe was purchasing property on North Wells Street in Chicago for redevelopment purposes and was using the land trust device to conceal his acquisitions. All of the properties involved in this appeal are on North Wells Street. The land trust device was apparently used to conceal a receiver's personal ownership in the properties. The buildings on three of these properties were demolished during the receivership period pursuant to order of court. Through his manipulations in this case, Keefe was able to secretly acquire four properties on North Wells Street, three of which were ultimately vacant, and was thereby able to further his apparent speculation in the redevelopment of the properties. The conclusion is inescapable that Keefe intentionally, wilfully, and knowingly used nominees and agents as well as the land trust device and his final reports to the court so as to actively conceal his self-dealings in receivership property.

 It must not be forgotten that Keefe was a duly appointed receiver when he surreptitiously acquired own-

ership in the property entrusted to his care. As a receiver, he was an officer of the court which had appointed him, held the property entrusted to him in custodia legis, and had to be most fair and frank in all of his dealings with the court. Strong v. Friedman, 261 Ill App 602, 620 (1931). The record clearly demonstrates that Keefe did not deal with the court fairly and frankly in this case. It does not matter that no person interested in the properties as owner or mortgagee complained of Keefe's conduct as receiver. The contempt was practiced on the court. Although Keefe's express powers did not relate to ownership, this did not mean that he could conceal his ownership from the court when filing his final accounts. His duties as receiver required that he act fairly and frankly with the court. Instead of secretly acquiring title, Keefe was duty-bound to first inform the court of his intentions and ask its permission after serving notice on all other parties interested in the receivership proceedings. This was not done. The record discloses an intentional deception designed to conceal a serious breach of trust. Criminal contempt of court was proved beyond a reasonable doubt.

■ Neither do we sustain the respondent's argument that he violated no fiduciary duties in the acquisition of the properties since he acquired title at judicial sales and not from himself during the receivership period. The cases chiefly relied upon (Victor v. Hillebrecht, 405 Ill 264, 90 NE2d 751 (1950); Melin v. Melin, 189 Iowa 370, 178 NW 346 (1920); Magic City Amusement Co. v. Hastings, 189 Okla 262, 116 P2d 709 (1941); Starkweather v. Jenner, 216 US 524, 528 (1910); and Allen v. Gillett, 127 US 589, 595–96 (1888)), all involve factual situations in which the fiduciary bought trust property for his own benefit at either a judicial sale or in the open market and the purchase was allowed because he did not have any control over the sale, he did not solicit it nor bring it about, and there was no fraud in the acquisi-

tion. In the case at bar, the evidence is overwhelming that the fiduciary, Keefe, controlled the judicial sales by paying Jack Winkler not to attend the foreclosures and by acquiring the interests of Eager, the first mortgagee who had already instituted mortgage foreclosure proceedings and who was to be the successful bidder in Keefe's behalf.

Fraud in the acquisition was demonstrated by the use of nominees, Eager and Carter, to conceal true ownership in the fiduciary. It is clearly demonstrated that Keefe's personal interests as purchaser conflicted with his fiduciary interests as receiver and that he voluntarily attempted to derive personal profit from his office other than proper compensation. In Ravlin v. Chicago, A. & De K. R. Co., 217 Ill App 213, 217 (1920); affirmed 297 Ill 130, 144, 129 NE 730, 736 (1921), a receiver was ordered to pay a sum in excess of $47,000 which represented the profits from secret sales of assets entrusted to his care as receiver. The facts of this case call for a like remedy.

The respondent also asserts that Judge Julian P. Wilamowski, the judge who appointed him receiver, had full prior knowledge of his purchase of Eager's mortgage interests and had no objection to these acquisitions. Judge Wilamowski, who had presided over the receivership proceedings for two years on temporary assignment before returning to Henry County, did write a letter to Keefe in answer to the respondent's written request. Keefe bases his assertion upon this letter. His reliance is misplaced. In the letter, Judge Wilamowski states that he was surprised and shocked to learn that Keefe had acquired ownership in slum properties. The jurist also indicated that if he participated in any conversation having to do with Keefe's purchase of Eager's mortgage interests, it would be reflected in the record. He recommended that Keefe obtain a transcript of such a record. No such transcript is found in this record. Since

the respondent's contention is not supported by the evidence, it must be rejected.

██ The respondent also attacks the severity of the punishment contending that the trial court had no power to order a judicial sale since the receivership proceeding did not authorize a sale; that the decree is ambiguous in that it does not provide for the resolution of any possible differences in the three appraisals to be made; that the decree imposes a double fine or hidden fine on Keefe in that it assumes that the proceeds realized from a forced judicial sale will be identical with the appraised value of the properties; that the appraisals should be made apparently as of the date of Keefe's purchases rather than the date of the decree so as to avoid any appreciation of real estate values in the intervening three years; and that the penalty is not proportioned to the nature of the offense. While we agree with the respondent's contention that the decree is ambiguous in that it does not provide for the resolution of any possible differences in the three appraisals to be made, we are of the opinion that, within the circumstances of this case, this factor is best left to the trial court for a final resolution. The three appraisals are not included in this record. Neither is the computation of the additional fine to be paid by Keefe. Since Keefe filed an appeal bond in the trial court, it is apparent to us that probably no appraisals have been made and the additional penalty to be paid has not yet become a liquidated amount. Rather, the parties are awaiting a final determination of this litigation on appeal. When this case is returned to the trial court for the computation of the additional penalty, it will resolve this ambiguity.

We are not persuaded by the respondent's other contentions regarding the severity of the penalty. This is an extraordinary case requiring remedies not often invoked by the courts. It is obvious from the terms of the

penalty that it was designed to punish Keefe for his contempt of court by depriving him of any profit which may have resulted from his cavalier breach of trust. It had the effect of vindicating the dignity and authority of the court. Keefe has only himself to blame for its imposition. This court will not interfere with the penalty.

The decree is affirmed.

Decree affirmed.

BURKE and McCORMICK, JJ., concur.