THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DWAYNE COULTER, Defendant (James Rhodes, Contemnor-Appellant).

First District (1st Division)   No. 1—88—0206

Opinion filed March 16, 1992.

Randolph N. Stone, Public Defender, of Chicago (Robert P. Isaacson, Assistant Public Defender, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb, James Fitzgerald, and William P. Pistorius, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

Contemnor James Rhodes, chief of the multiple defender unit of the office of the Cook County Public Defender, appeals from an order of the circuit court of Cook County finding him in direct criminal con-

tempt and imposing a $500 fine. The alleged contempt arose during pretrial proceedings in the case of *People v. Coulter* (1992), 230 Ill. App. 3d 209, which was tried before the Honorable James M. Bailey, and which this court heard on appeal on October 9, 1990. For the reasons which follow, we reverse.

The facts necessary to an understanding of the contempt order are as follows.

THE FITNESS HEARING

Dwayne Coulter was charged with murder and conspiracy to commit murder. The State sought the death penalty. Prior to trial, the court allowed a hearing on Coulter's fitness to stand trial. On March 23, 1987, the State requested that the defense provide a list of defense witnesses for the fitness hearing. Contemnor responded that the discovery rules did not require he disclose a list of witnesses on fitness. The court noted that such discovery was required under the Illinois Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 1—101 *et seq.*). The State argued that disclosure was required by Illinois Supreme Court Rule 201(b) (134 Ill. 2d R. 201(b)). Contemnor eventually identified the witnesses the defense intended to call at the hearing.

At this time, the State also requested a psychiatric report prepared by defense expert Dr. Conroe concerning his most recent examination of Coulter. Contemnor replied that there was no such report. The State then subpoenaed Dr. Conroe to appear in court.

Dr. Conroe ignored the subpoena, and the court contemplated issuing an arrest warrant. The court heard the testimony of Cook County sheriff's police officer Dalcason that Dr. Conroe was personally served with the subpoena at 8:53 a.m. for a 9 a.m. appearance. Contemnor then requested that he be allowed to call one of the assistant State's Attorneys on the case to testify, but the trial court denied this request.

Dr. Conroe arrived in court later that afternoon. Dr. Conroe testified that he did not have a report relating to his most recent examination of Coulter. However, he did have notes relating to this examination, which the trial court then ordered the defense to disclose to the State.

At this hearing, Assistant State's Attorney Kaplan also told the court that another expert, Dr. Hemmerich, had examined Coulter and written two reports, neither of which had been tendered to the State by the defense. After Dr. Conroe stated that he relied on Dr. Hemmerich's report dated May 6, 1986, this report was tendered to the State. The other report, however, was not tendered because Dr. Con-

roe stated that he did not rely on it. The State argued that it was entitled to the report regardless of whether Conroe relied on it. Although contemnor initially told the court that the document did not go to the issue of Coulter's fitness to stand trial, he then said it did go to Coulter's fitness and overall psychological conditions. The court ordered discovery of the document.

During the fitness hearing itself, the court allowed the State to conduct a *voir dire* of Dr. Hemmerich to determine whether he might be called by the State as a rebuttal witness. Out of the presence of the jury, Dr. Hemmerich testified that after his second examination of Coulter, he found Coulter to be fit to stand trial. Hemmerich also testified that he sent a letter to contemnor dated November 17, 1986, regarding his examination and conclusions. This letter was the report which the State had sought and discovered prior to the hearing.

Later, in the presence of the jury, Dr. Conroe testified that he had conferred with Dr. Hemmerich after Hemmerich's examination of Coulter in November and had seen Hemmerich's November report. Defense counsel's motion for a new hearing based upon the disclosure of Hemmerich's November report was denied. Dr. Hemmerich was not called as a rebuttal witness; the jury found Coulter fit to stand trial.

THE SUPPRESSION HEARING

On May 27, 1987, the court heard pretrial motions, including a defense motion to suppress statements Coulter made while in custody. Contemnor requested leave to file a supplement which added the names of about 30 police officers to the motion. The State objected, noting that two of the names listed were evidence technicians who did not see Coulter on the day in question. However, the State did not move for a continuance. The court told contemnor he would be fined if he could not tie each of the witnesses to the motion. Contemnor replied that he had not intentionally listed witnesses who did not see Coulter. During the suppression hearing, the court fined contemnor $500 for failing to tie one of the witnesses to the motion. The record does not contain a written court order regarding this fine. Nor does the record indicate whether the $500 was ever collected.[1] The motion to suppress was denied.

---

[1] The record, furthermore, does not indicate any attempt by the State to collect this fine.

HEARINGS ON THE MOTION TO BAR EXPERT TESTIMONY REGARDING THE INSANITY DEFENSE

On March 27, 1987, after the fitness hearing and before the suppression hearing, defense counsel filed his answer to the State's motion to discovery, indicating a possible insanity defense. The State then requested, in court, that the defense disclose any relevant psychiatric reports. Contemnor replied that there were no such reports.

On June 1, 1987, the court granted the State's request for a court order allowing Coulter to be examined by Dr. Kavanaugh. A month later, the State moved to bar defense expert testimony on Coulter's sanity because it had not received any reports on the issue from the defense, and Coulter had not cooperated with Dr. Kavanaugh on his third examination. It is unclear from the record whether Kavanaugh ever fully examined Coulter.

On July 7, 1987, the court suggested that the State subpoena Drs. Conroe and Hemmerich, who had examined Coulter to determine whether he was fit to stand trial, to discover whether they had written reports on whether Coulter was sane at the time of the offense.[2] Contemnor objected, stating that all the reports had been tendered and all the witnesses were listed in the defense answer to the State's request for discovery.

The record indicates that there were about 130 potential witnesses listed in the answer; approximately 10 of these were doctors. Contemnor stated that most of the names came from the State's list of approximately 190 potential witnesses. The court warned contemnor that if there were any undisclosed reports, contemnor would see what the court would do.

The following day, July 8, the State reported that Dr. Conroe had stated by phone that he had no reports on sanity. Dr. Hemmerich refused to speak to the State and was served with the subpoena. The State asserted that it had a right to know which of the doctors listed in the answer might testify on the insanity defense. The court held contemnor in civil contempt, jailing him after he refused to specify which of the witnesses listed in the answer might testify on the insanity defense. Later, Dr. Hemmerich testified that he had an opinion on

---

[2]Such documents may or may not be discovered during discovery for a fitness hearing because the question of whether a defendant was insane at the time of an offense is a separate inquiry from the question of whether a defendant is fit to stand trial at some time subsequent to the offense. See, e.g., People v. Kaufman (1978), 67 Ill. App. 3d 36, 40, 384 N.E.2d 468, 471.

Coulter's sanity, but it was not written down. The court stated the defense would be barred from presenting expert testimony on the insanity issue unless Dr. Hemmerich provided a written summary of his opinion.

THE CONTEMPT PROCEEDINGS

A one-page summary of Dr. Hemmerich's opinion on Coulter's sanity at the time of the offense was tendered to the State on September 8, 1987. That same day, contemnor was found in criminal contempt of the trial court. The next day, the trial court held proceedings at which the court gave reasons for this finding. The court said it would allow contemnor to make a statement in mitigation. A request for a separate hearing on the matter was denied. The record of the proceedings indicates that contemnor was fined $1,000, but the written order indicates the amount of $500. At oral argument, neither side could explain the reason for the reduction to this court. The circuit court stayed execution of the order until after the trial. Defendant's motion to vacate the contempt order was subsequently heard and denied.

■ The threshold issue in this appeal is whether the contempt order is invalid for failing to fully, clearly and specifically set forth the facts upon which it is based. It is well settled that a judgment order of direct criminal contempt must set forth the specific facts which form the basis for the order. (*E.g., People v. Loughran* (1954), 2 Ill. 2d 258, 263, 118 N.E.2d 310, 313.) Findings of direct criminal contempt are typically summary in nature, without extensive procedural protections for the alleged contemnor (see *People v. L.A.S.* (1986), 111 Ill. 2d 539, 543, 490 N.E.2d 1271, 1273); consequently, persons found in direct contempt of court have a right of appeal. (*Loughran*, 2 Ill. 2d at 263, 118 N.E.2d at 313.) The contempt order must therefore provide those facts necessary for meaningful appellate review. (See *Kotowski v. Kotowski* (1971), 3 Ill. App. 3d 231, 233, 278 N.E.2d 856, 857.) However, where a complete record of the proceedings giving rise to the contempt order is available, together with the statements of the court regarding the order, an appellate court will consider that record when reviewing a contempt order. *People v. Tomashevsky* (1971), 48 Ill. 2d 559, 273 N.E.2d 398.

In this case, the order mentions four instances where contemnor was warned that his conduct would result in a finding of contempt. In giving reasons for the order, the court singled out the proceedings on the motion to bar expert testimony on the insanity defense and the fact that defense experts had to be subpoenaed into court to deter-

mine whether all relevant reports had been discovered. The court also stated:

> "He [contemnor] has given me doubletalk through the whole thing, and I'm sure any reviewing court will be able to have the proceedings from July 8 as well as July 7, as well as the further—the other transcripts which we had during the—during the hearing on the—on the fitness for trial."

The contempt order also indicates that "a full and complete transcript of the relevant proceedings is attached to, and made and [sic] integral part of this Order." The entire record of the underlying proceedings has been made available to this court.

The record indicates two instances where contemnor was warned and then found in contempt. The first instance occurs at the suppression hearing. However, neither the order nor the hearing on the finding of contempt contains a specific reference to contemnor's behavior at the suppression hearing.

The second instance occurs at the hearings on the motion to bar expert testimony on the insanity defense. Contemnor was jailed for refusing to identify which witnesses might be called on the insanity issue. This finding of contempt, designed to force contemnor to comply with the court's order, was civil in nature and was purged when contemnor complied with the court's request. (*E.g., People v. Gray* (1976), 36 Ill. App. 3d 720, 344 N.E.2d 683, *aff'd* (1977), 69 Ill. 2d 44, 370 N.E.2d 797.) Consequently, the court is left with a general order. Neither the order nor the record clearly indicates which incidents were intended to form the basis of the contempt order in a way which allows for meaningful appellate review.

■ Even if we were to assume that the order, combined with the hearings on the finding of contempt, was sufficiently specific, we would reverse the order. A finding of direct criminal contempt requires proof that the acts which allegedly form the basis for the contempt order were calculated to embarrass, hinder or obstruct a court in its administration of justice or to derogate from its authority or dignity or to bring the administration of law into disrepute. (*E.g., L.A.S.*, 111 Ill. 2d at 539, 490 N.E.2d at 1271; *People v. Siegel* (1983), 94 Ill. 2d 167, 445 N.E.2d 762.) Both elements of criminal contempt, an intent and an act, must be proven beyond a reasonable doubt. (*City of Chicago v. Hart Building Corp.* (1969), 116 Ill. App. 2d 39, 253 N.E.2d 496.) Intent in criminal contempt cases has been defined as a voluntary act by one who knows or who should reasonably know that the act is wrongful. (*People v. Bertelle* (1987), 164 Ill. App. 3d 831, 833, 518 N.E.2d 332, 334.) Therefore, if contemnor can show

that his conduct was a good-faith attempt to represent his client without hindering the court's functions or dignity, a finding of direct contempt will be reversed upon review. *People v. Miller* (1972), 51 Ill. 2d 76, 281 N.E.2d 292.

■ Moreover, we recognize that "[w]here *** the conduct complained of is that of an attorney engaged in the representation of a litigant, the search for [the] essential elements of the crime of contempt must be made with full appreciation of the contentious role of trial counsel and his duty of zealous representation of his client's interests." (*In re Dellinger* (7th Cir. 1972), 461 F.2d 389, 397.) Nowhere must this search be more careful than in cases involving the death penalty. *Cf. Wilson v. Wainwright* (Fla. 1985), 474 So. 2d 1162, 1164 (due process requires zealous representation; an advocate's duty in this regard is "the very foundation of justice" in capital cases); *State v. Williams* (1983), 93 N.J. 39, 459 A.2d 641 (defendant's rights are entitled to most zealous protection in capital case).

Accordingly, in the context of deciding whether direct criminal contempt has occurred, this court may consider any provocation or error by the trial court which may have triggered the attorney's remarks. (*People v. Pearson* (1968), 98 Ill. App. 2d 203, 240 N.E.2d 337.) Provocation is not a defense to contempt, but the circumstances of the underlying proceedings may be weighed in determining whether the offense has been proved beyond a reasonable doubt. See *Bertelle*, 164 Ill. App. 3d at 836, 518 N.E.2d at 335-36.

■ Here, the trial court erred during the hearings on the motion to bar expert testimony on the insanity defense. For example, in *People v. Fleming* (1987), 155 Ill. App. 3d 29, 507 N.E.2d 954, this court held that there is no duty for parties to reduce a witness' testimony to writing in the absence of bad faith. However, *Fleming* also held that requiring such a writing was harmless error in that case. (*People v. Coulter* (1992), 230 Ill. App. 3d 209, citing *Fleming*, 155 Ill. App. 3d at 40, 507 N.E.2d at 961).) The error in Coulter's trial was also harmless. (*Coulter*, 230 Ill. App. 3d 209.) Moreover, the State has not cited any specific authority which explicitly requires defense counsel to disclose which witness may testify about an issue.

Although contemnor has not established that these orders were invalid, as opposed to merely erroneous (compare *People v. Shukovsky* (1988), 128 Ill. 2d 210, 538 N.E.2d 444 (void orders cannot form the basis of a contempt order), with *People v. Graves* (1979), 74 Ill. 2d 279, 384 N.E.2d 1311 (order which is merely erroneous can form basis for contempt order)), these errors may be weighed in deciding whether the State has proved its case beyond a reasonable doubt.

Furthermore, this court may weigh any conduct of the trial court which may have served as a predicate for contemnor's conduct. (See *Bertelle*, 164 Ill. App. 3d at 836, 518 N.E.2d at 335-36.) The record in this case contains a number of exchanges indicating a strained relationship existed between contemnor and the trial court. For example, regarding whether the defense was required to turn over Dr. Hemmerich's reports on Coulter's fitness to stand trial, the court stated that:

"[F]or you to set [*sic*] there and basically tell me he [Dr. Conroe] did not rely on the report [of Dr. Hemmerich], when he [Dr. Conroe] said that he had read the report and do [*sic*] forth, I really think this is intellectual dishonesty on your part.

\* \* \*

I wonder ethically whether you can intellectually say that and still be honest. I mean, I question your ethics."

The defense responded that their position was that the material was protected by the fifth amendment to the constitution.

Later, when the State sought to bar expert testimony regarding the insanity defense, contemnor suggested that the reason the State did not know which witnesses might testify on insanity was that the State had failed to investigate its case by talking to the potential witnesses. The court responded:

"The record will show exactly what happened, Mr. Rhodes. Your psychologist and psychiatrist came in here and testified after they got mad because they had to come in here, after I was going to issue a warrant for the one, \* \* \* and he was very disturbed that he had to come in here then you ran back and called him and told him I was going to issue a warrant for him, that is the only reason he came in. Then you threatened my secretary at the time I was issuing a warrant and don't leave phone numbers everything else. So don't tell me, the record will show exactly what you did."

Contemnor denied threatening the court's secretary. Nonetheless, the trial court denied contemnor's request that the secretary be put on the witness stand.

In addition, when the court found contemnor in civil contempt during these hearings, the court told contemnor:

"Now, I don't know where you are going, you'd never make it in private practice.

Put him back in a cell until he writes down the name of every witness you [*sic*] are going to have as far as the insanity defense is concerned."

Following a recess, contemnor was again before the trial court. Contemnor reasserted his belief that he was in compliance with discovery, to which the court responded:

> "Shut up, Mr. Rhodes, or you will be spending the night over there [presumably jail]. Mr. Rhodes, shut up when I am talking, keep your mouth shut until I am finished. Do you understand that?"

On July 10, 1987, hearing a motion for continuance, the trial court stated:

> "Now, Mr. Rhodes, I wish to carefully read to you from the [S]upreme Court Rules, Rule 7.01, which is Cannon [*sic*] 7, and 7.02, which is all part of cannon [*sic*] 7, the responsibilities of a lawyer. I am doing it for a reason. When this trial is over, I intend to have transcripts sent to the Attorney Registration Commission.
>
> And the question really is should you continue being the attorney in this case. And I want you to carefully read those articles because I will quote them throughout the course of the trial because I continually worry about your responsibility as an attorney to the profession and to your client, which is more important."

The record indicates that the trial court did not hold a high opinion of contemnor's behavior or strategy. Nevertheless, a finding of direct criminal contempt cannot rest upon mere opinion or the presumptions of the trial court. (*People ex rel. Woodward v. Oliver* (1975), 25 Ill. App. 3d 66, 322 N.E.2d 240.) Thus, even if the contempt order had been sufficiently specific, the record indicates that the State has failed to prove contemnor in contempt beyond a reasonable doubt.

Given our disposition of these issues, we find it unnecessary to address the remainder of contemnor's arguments. For the aforementioned reasons, we reverse the judgment of the circuit court.

Judgment reversed.

O'CONNOR and MANNING, JJ., concur.