THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANN RAE HEITLAND, Defendant-Appellant.

Fifth District   No. 5—92—0507

Opinion filed December 29, 1993.

Roger Pascal, Michael L. Brody, and Aphrodite Kokolis, all of Schiff, Hardin & Waite, of Chicago, for appellant.

William Haine, State's Attorney, of Edwardsville (Norbert J. Goetten, Stephen E. Norris, and Rebecca Sanders, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE MAAG delivered the opinion of the court:

Defendant, Ann Rae Heitland, an attorney, appeals from an order of the circuit court of Madison County finding her guilty of direct criminal contempt for improper conduct that allegedly occurred during the course of a trial in which she defended Keene Corporation.

The relevant facts are as follows: The defendant was lead defense counsel in the trial of Garner v. Keene Corporation, No. 90—L—1107, an asbestos case tried before Judge Phillip J. Kardis in Madison County circuit court. The finding of contempt arose out of the defendant's direct examination of Dr. Myron Jacobs, Keene Corporation's medical expert. During the course of the defendant's direct examination of Dr. Jacobs, she asked him the following questions:

"Q. Did you have chest [X]rays *available* for review in Mr. Garner's case?

A. I did.

Q. Did you also have reports of radiologists and B-readers in Mr. Garner's case?

A. I did.

Q. And what did you conclude regarding Mr. Garner's chest [X]rays?" (Emphasis added.)

Paul Hulsey, plaintiff's counsel, objected and asked the court for a side bar. During the side bar, Hulsey stated that he objected to "Dr. Jacobs describing what *he saw* on the [X]rays." (Emphasis added.) The basis for plaintiff's counsel's objection was that during Dr. Jacobs' discovery deposition, he could not "recall specifically looking at any of the chest [X]rays and essentially relied on the B-reader's report." Hulsey further stated that he had not had an opportunity to cross-examine Dr. Jacobs about what "he himself saw on the [X]rays."

The defendant agreed with Hulsey that Dr. Jacobs could not remember if he had looked at each X ray; however, the defendant claimed that she was not asking Dr. Jacobs to describe what *he saw* on the X ray. Instead, the defendant explained that she was merely asking Dr. Jacobs for his conclusions with respect to the chest X rays, based upon the fact that he had B-reader reports, radiologist reports, and chest X rays available to him.

The court requested the court reporter to read the defendant's question back to him. After the question was read to the court, Hulsey remarked that the previous question was, "Did you have [X]rays available to you?" The court then stated as follows:

"I'm a little concerned about counsel's misrepresentation to the court about questions that is [*sic*] directly opposite of what you just represented to me. As an Officer of the Court, I think you have a responsibility not to misrepresent. You just —"

The defendant interrupted the court and asked whether it was speaking to her or Hulsey. The court said:

"I'm looking right at you. I'm speaking to you. The question was whether or not he *reviewed* the [X]rays, and that was the basis of the question. You just represented to me that your question was solely based on the reports. That's not accurate." (Emphasis added.)

The court sustained the objection to the testimony regarding Dr. Jacobs' review of the X rays and instructed the jury to disregard the

question as posed. The defendant persisted, however, that she did not believe that she had misrepresented anything to the court.

The defendant resumed Dr. Jacobs' direct examination. Jacobs testified that it is his normal practice as a pulmonologist to rely on B-reads made by other experts. The defendant then reiterated the question she had previously asked:

"Q. In Mr. Garner's case, did you have chest [X ]rays available?

A. I did.

Q. Based on everything you had available regarding—."

Hulsey objected and the court sustained the objection. The court stated the following:

"Counsel is admonished. The matter was gone into outside the presence of the jury. The objection was sustained. That matter is not to be gone into in front of the jury. You have just violated my order."

Whereupon the court instructed the jury to take a recess and dismissed the witness. The court asked the defendant if she had anything to say. The defendant submitted a copy of Dr. Jacobs' deposition which consisted of a cross-examination of Dr. Jacobs' chest X ray analysis. The defendant stated as follows:

"I believe that I am allowed to ask—I should be allowed to ask these questions and the proper manner to proceed is for Mr. Hulsey to pursue it on cross-examination, if he has the will to do that, based on this deposition transcript. On the other hand, if Mr. Hulsey does not have the ability to cross-examine this witness without assistance from the court barring proper direct examination; then we can pursue this."

The court stated that the defendant was in willful contempt of the court's order and asked her if she understood its order. After beginning to explain its order, the court stated that it needed to "think about this for a minute" and decided to take a five-minute recess.

When the court returned, it stated that it had found the defendant guilty beyond a reasonable doubt of direct contempt of his order. The court stated that it intended to sentence the defendant to less than six months' imprisonment in the county jail or fine her less than $500. The court further stated:

"[Defendant] had asked [Dr. Jacobs] whether or not he had *reviewed* [X ]rays of this plaintiff. There was an objection lodged. We looked at the transcript record of the deposition in chambers. We determined at that time that he had no recollection of having done that in his deposition. Based on that, I sustained

the objection, disallowing any further examination of the witness with regard to the [X ]rays. Upon returning to the courtroom, the first question—series of questions asked of the witness was a direct question: Did you *review* the [X ]rays of the plaintiff?" (Emphasis added.)

The defendant requested a hearing with counsel before the court pronounced her sentence.

On May 8, 1992, the trial court entered a written order of contempt. Contrary to the oral finding of contempt, the written order stated that the defendant was in contempt of court for asking whether the X rays had been *available*. The written order further stated that there had been an objection to the question, "Did you have chest [X ]rays available to you" and that objection had been sustained. The defendant timely filed a motion to reconsider and vacate the finding of contempt. The motion was set for hearing at the defendant's sentencing hearing on June 30, 1992.

On June 30, 1992, defendant's counsel, Roger Pascal, was present with the defendant at her sentencing hearing. During Pascal's opening statement in support of the defendant's motion to reconsider, the court asked Pascal for his understanding of the reason that the court had proscribed the defendant from asking the question that the defendant had been held in contempt for asking. Defense counsel replied as follows:

"First of all, I respectfully suggest it's difficult to tell. *** I believe that what was prescribed [*sic*] was exactly what Your Honor said was prescribed, [*sic*] and that is the question did he *review* the [X ]rays ***." (Emphasis added.)

The court then asked defense counsel for the basis of the court's ruling. Defense counsel stated: "I can't be sure. I'll give you my best understanding as I read the transcript with the benefit of hindsight. *** [W]ith all due respect, I think the Court was misguided by [Mr. Hulsey] [when Mr. Hulsey said,] 'Your Honor, my objection will be to Dr. Jacob[s] describing what he saw on the [X ]rays.' " Finally, defense counsel stated that he believed Mr. Hulsey had convinced the court that the deposition of Dr. Jacobs included a statement by Dr. Jacobs that he had not looked at the chest X rays. Defense counsel stated, however, that he could not figure out the basis of Mr. Hulsey's objection.

The court stated, "You're seriously telling me that you have no idea?" Defense counsel answered in the affirmative, and the court instructed him to proceed. Despite counsel's repeated attempts to ascertain the basis of the court's finding of contempt, the court refused to

explain its ruling, stating that he was "flabbergasted" and "absolutely astounded" that defense counsel did not know the basis of his ruling. Thereafter, the court denied the motion to vacate.

The defendant took the stand and testified that she understood from the court's first ruling that she was prohibited from asking Dr. Jacobs about his *review* of the X rays. After defense counsel's direct examination of the defendant, he asked the court to reconsider and vacate its prior order. The court denied the motion and fined the defendant $250.

The court finally revealed its basis for sustaining Hulsey's objection after it stated that it did not believe that defense counsel did not understand the basis for its ruling. The court expressed its astonishment as follows:

"No matter how many times you state that, in all sincerity, I do not believe it and never will believe it. This was absolutely[,] unequivocally[,] and clearly a [Supreme Court Rule] 220 ruling. I don't know why I even have to mention those three numbers. *** [T]hat was the only basis for the ruling. *** It was a very clear consideration. It has been discussed many times before with other expert witnesses. *** I would just like to stand up and look you in the eye and say 'baloney.' Your position in this matter is, in my opinion, baloney. ***

I do not understand how experienced trial counsel can argue any other position."

Pascal asked if he could respond to the Rule 220 ruling. The court denied Pascal's request. He further ordered that the defendant not pass the cost of the defense of the contempt proceeding to Keene Corporation. The court believed that the expenses in defending the contempt matter could have been between $5,000 and $10,000; therefore, the court reasoned that if the defendant were fined $250, this would have been a very profitable case for the defendant and her firm. The court refused to stay imposition of the fine and ordered that it be paid within two weeks. The defendant complied and filed a timely notice of appeal.

■ Initially, we note that it is apparent that the court's ruling in the case at bar centered around Supreme Court Rule 220(d) (134 Ill. 2d R. 220(d)), which provides:

"To the extent that the facts known or opinions held by an expert have been developed in discovery proceedings through interrogatories, depositions or requests to produce, *his direct testimony at trial may not be inconsistent with or go beyond the fair scope of the facts known or opinions disclosed in such*

*discovery proceedings.* However, he shall not be prevented from testifying as to facts or opinions on matters regarding which inquiry was not made in the discovery proceedings." (Emphasis added.)

It is obvious that the court was understandably concerned that the defendant was violating the aforementioned rule because she was leading the jury to believe that Dr. Jacobs had reviewed the chest X rays himself when the deposition showed that Dr. Jacobs could not remember whether he had personally reviewed each X ray.

■ Our inquiry, however, is not whether the trial court's ruling was correct as a matter of law. (*People v. Graves* (1977), 54 Ill. App. 3d 860, 862, 370 N.E.2d 253, 254.) The sole question on review in a direct criminal contempt matter is whether there is sufficient evidence to support the finding of contempt. (*People v. Graves* (1979), 74 Ill. 2d 279, 284, 384 N.E.2d 1311, 1314.) A finding of direct criminal contempt requires proof that the acts which allegedly formed the basis for the order of contempt were calculated to embarrass, hinder, or obstruct the court in its administration of justice or to derogate from its authority or dignity or to bring the administration of law into disrepute. *People v. Coulter* (1992), 228 Ill. App. 3d 1014, 1020, 594 N.E.2d 1157, 1160.

It is the defendant's contention that the trial court's ruling finding her in contempt was ambiguous and that due process prohibits imposition of punishment in this situation. (See *Graves*, 74 Ill. 2d at 285, 384 N.E.2d at 1314.) We are extremely reluctant to agree with the defendant; however, the defendant is technically correct that the trial court's ruling was ambiguous. A review of the record demonstrates that the court believed that the defendant had asked Dr. Jacobs whether he had *reviewed* the X rays, when, in fact, the defendant had asked Dr. Jacobs if the X rays had been *available* to him. No objection was made to this particular question. The next question the defendant asked was as follows:

"Q. And what did you conclude regarding Mr. Garner's chest [X ]rays?"

Hulsey's objection was lodged at this point as he stated that he objected to "Dr. Jacobs describing what *he saw* on the [X ]rays." (Emphasis added.) After the defendant resumed Dr. Jacobs' direct examination, she asked the availability question again. Once again, no objection was made. The next question she asked was as follows:

"Q. Based on everything you had available regarding —."

At this point, Hulsey objected and the court sustained the objection. The court determined that the defendant was in contempt of the

court's previous order for asking Dr. Jacobs if he had *reviewed* the X rays. The written finding of contempt, however, stated that the defendant had been held in contempt for asking whether the X rays had been *available*. The court mistakenly added that there had been an objection to the *availability* question and that objection had been sustained.

■ For the aforementioned reasons, the trial court's ruling was ambiguous on a technical level. Therefore, we cannot say that the defendant committed contempt of court by asking Dr. Jacobs about the *availability* of the X rays. However, we believe that it is of considerable significance that the defendant is an experienced trial attorney. As such, we find it extremely troublesome that the defendant did not understand the court's ruling. In turn, we cannot fathom how the defendant could have truly misconstrued the trial court's ruling.

We believe that most judges

> "recognize and respect courageous, forthright lawyerly conduct. They rarely mistake overzeal or heated words of a man fired with the desire to win, for the contemptuous conduct which defies rulings and deserves punishment. They recognize that our profession necessarily is a contentious one and they respect a lawyer who makes a strenuous effort for his client." *Sacher v. United States* (1952), 343 U.S. 1, 12, 96 L. Ed. 717, 725, 72 S. Ct. 451, 456.

We praise the trial judge in the case at bar for his patience in dealing with the dilatory disrespect of the defendant, and we make a caveat to those fond of disregarding the rulings of the trial court: This court "will not equate contempt with courage or insults with independence." (*Sacher*, 343 U.S. at 13-14, 96 L. Ed. at 726, 72 S. Ct. at 457.) We will, however, "protect the processes of orderly trial, which is the supreme object of a lawyer's calling." (*Sacher*, 343 U.S. at 14, 96 L. Ed. at 726, 72 S. Ct. at 457.) Hence, it is with extreme reluctance that we reverse the trial court's finding of criminal contempt. Since we are reversing the defendant's conviction of contempt because the trial court's order was ambiguous, we find that it is not necessary to address the defendant's remaining contentions of error.

In light of the foregoing considerations, we reverse the defendant's conviction for contempt.

Reversed.

WELCH and GOLDENHERSH, JJ., concur.